[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10969

_____

D.C. Docket No. 1:17-cr-20530-RNS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TODDREY BRUCE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 8, 2020)

Before MARTIN, GRANT, and LAGOA, Circuit Judges.

GRANT, Circuit Judge:

At 3:20 a.m., an unnamed 911 caller reported that men were outside arguing next to a white car. One had a gun. The caller warned that responding officers should be careful because there "might be shooting any minute from now." Minutes later officers were on scene, lights flashing, in an area of Miami-Dade

County that accounted for a disproportionate number of their patrol area's 911 calls. They saw two men sitting in a car at the address the caller had specified. The officers approached cautiously, guns drawn. One of the men in the car—Toddrey Bruce, who had a prior felony conviction—tried to flee. An officer tackled him, and a loaded pistol fell from Bruce's waist. The police arrested him on a felon-in-possession charge.

Bruce now argues that the police should not have stopped him because they lacked reasonable suspicion that he had engaged in criminal activity. But given the details of the 911 call, the time of day, and the high-crime area, the officers could reasonably suspect that Bruce had engaged in criminal activity. Bruce also argues, for the first time on appeal, that the police needed more than reasonable suspicion because they stopped him in an area that was an extension of a home, known as curtilage. But because the facts before us do not show he was within the curtilage of his home—or, really, anyone's home—Bruce's new argument does not help him. Seeing no error, we affirm the district court's judgment.

I.

The recorded 911 call came in a little after 3:00 a.m. An unnamed man said that he saw a "disturbance" in the front yard of a "drug house"—and that one of the men involved had a gun. When the 911 operator asked what was happening "as we speak right now," the caller replied that "they're arguing in the front yard." The caller described the person holding the gun as a black man dressed in all black, and said that he was standing next to a white car in front of the house. Before the

2

call ended, the tipster warned that the police should use caution because there "might be shooting any minute."

Dispatch quickly relayed the key parts of this call to the police. The dispatch message told police (in shorthand) about the "argument in front yard, and black male standing next to white vehicle, and this subject holding handgun." Officers were also given the address in the Perrine neighborhood where the disturbance was taking place. Several officers were nearby because Perrine accounted for about half of the 911 calls for their zone, even though the neighborhood was only a small portion of the entire area they patrolled. Within five minutes, flashing police lights were at the scene.

The approaching officers saw two men in the white car at the specified address. For safety reasons, they drew their guns as they drew near to the car. Their priority, as one officer explained, was "officer safety" and the safety of people who might be "gathered in the area." When they told the men to exit the car, Bruce tried to make a break for it. One of the officers grabbed him, and in the scuffle a loaded semi-automatic pistol dropped from Bruce's waistband. Though officers soon discovered that Bruce and his associate were likely arguing with someone on the phone rather than with each other, they also found out that Bruce was a felon—meaning that it was illegal for him to carry a gun.

Bruce was charged with unlawful possession of a firearm under 18 U.S.C. § 922(g)(1). He moved to suppress evidence of his gun, as well as incriminating statements he made after his arrest. The district court denied the motion; it found that the police were conducting a valid investigatory stop. After the court reached

3

its decision, Bruce pleaded guilty but reserved the right to appeal the lawfulness of the investigatory stop.  He now exercises that option.

## II.

We review the district court's legal conclusions on Fourth Amendment questions de novo, viewing all facts "in the light most favorable to the prevailing party below."  *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012) (citation omitted).  We review for plain error any theories supporting a motion to suppress that were not raised below.  *United States v. Young*, 350 F.3d 1302, 1305 (11th Cir. 2003).  "For a plain error to have occurred, the error must be one that is obvious and is clear under current law."  *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013) (citation omitted).

## III.

As mentioned at the outset, this case presents two main issues.  We first decide whether the officers' investigatory stop was justified based on a reasonable suspicion of criminal activity.  Given the 911 call reporting a gun-wielding man arguing in the dark hours of the morning, we think the answer is yes.  We then consider Bruce's argument that the officers needed *more* than reasonable suspicion because the stop occurred on the curtilage of a home.  This new and fact-intensive argument does not survive plain error review, so it does not disturb our previous conclusion that the investigatory stop was justified.

### A.

The Fourth Amendment secures the right of the people "against unreasonable searches and seizures."  U.S. Const. amend. IV.  Brief investigative

4

stops have long been recognized as reasonable, at least under appropriate circumstances. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Officers "may briefly detain a person as part of an investigatory stop if they have a reasonable articulable suspicion based on objective facts that the person has engaged in criminal activity." *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995).

To have reasonable suspicion, an officer needs "at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quotation marks and citations omitted). We look to the totality of the circumstances to decide if the police had reasonable suspicion. *See United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007). This reasonable-suspicion inquiry ultimately hinges on "both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990).

The Supreme Court has been clear that "an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop.'" *Navarette*, 572 U.S. at 397 (quoting *White*, 496 U.S. at 327) (punctuation omitted). So we first review the reliability of the tip here—the 911 call—and then consider how it informs the reasonable-suspicion analysis on these facts.

1.

Bruce insists that the officers had no reason at all to find the anonymous tip reliable, but that's just not so. For purposes of a brief investigatory detention like the one we consider here,[1] an anonymous 911 call giving eyewitness details of a real-time event is reliable enough "to credit the caller's account." *Navarette*, 572 U.S. at 398; *see also, e.g.*, *United States v. Mosley*, 878 F.3d 246, 253 (8th Cir. 2017); *United States v. Edwards*, 761 F.3d 977, 984 (9th Cir. 2014).

The Supreme Court in *Navarette v. California* considered a tip much like the one Bruce challenges. The unnamed 911 caller there reported that a silver pickup truck (identified by its make, model, and plate number) had just run her off the road. *Navarette*, 572 U.S. at 395. That "call bore adequate indicia of reliability" because the caller (1) "claimed eyewitness knowledge" of the event, (2) provided a "contemporaneous report," and (3) used the 911 emergency system. *Id.* at 398– 400. Each of those factors is also present here.

To start, the caller claimed eyewitness knowledge of the event. He told the 911 operator that "the person that I see out there with a gun is a guy" wearing "full black," gripping a gun, and arguing with another man. That matters—a key reason to worry about an anonymous tip is that, standing alone, it "seldom demonstrates the informant's basis of knowledge." *White*, 496 U.S. at 329. By itself, a tip is not reliable if it is a "bare report of an unknown, unaccountable informant who neither

---

[1] Reasonable suspicion would not have been enough for an arrest—that requires probable cause—but in his opening brief, Bruce does not argue that he was arrested when police told him to step out of the white car. Any challenge he had on that score has thus been abandoned, and we do not consider it. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004).

explained how he knew about the gun nor supplied any basis for believing he had inside information." *Florida v. J.L.*, 529 U.S. 266, 271 (2000).  But where, as here, the caller gives a first-hand account, that "basis of knowledge lends significant support to the tip's reliability"—even where the caller's identity is unknown.  *Navarette*, 572 U.S. at 399.[2]

The caller also gave a contemporaneous report, describing events as he was seeing them.  He told the 911 operator that he was reporting the argument "as we speak right now."  The dispatch message communicated this fact to the officers by using a progressive verb tense to describe Bruce's actions: "standing next to [the] white vehicle" and "holding [a] handgun."  And when officers responded a few minutes later, they confirmed that two men were near (by that time, inside) the white car at the address provided, which itself suggests that the caller reported in real-time.  "That sort of contemporaneous report has long been treated as especially reliable."  *Id.*

Finally, the fact that the tipster called 911 to report the incident proves to be another "indicator of veracity" under *Navarette*.  *Id.* at 400.  A 911 call can be traced if necessary, and can also be recorded (as it was here).  *See id.* at 400–01.  These tools diminish the chance that a lying tipster could hide behind the cloak of anonymity.  And if that were not enough, a caller can be prosecuted for providing a

---

[2] Although the unnamed tipster told the 911 operator that he was seeing the argument unfold, the record does not reveal whether the operator explicitly passed that fact along to police.  The district court considered the details of the 911 call itself (rather than only the dispatch report) when determining that the call was reliable, and Bruce did not question that approach in his opening brief.  Because he did not protest that approach, any challenge he might have made on that front "is deemed abandoned and its merits will not be addressed."  *Access Now*, 385 F.3d at 1330.

false tip. *See id.* at 400; Fla. Stat. § 817.49. That does not necessarily mean that every 911 caller is telling the truth—we assume that some do not. But it does mean that a "reasonable officer could conclude that a false tipster would think twice" before calling 911. *Navarette*, 572 U.S. at 401. Law enforcement would be hamstrung if it could not ordinarily "rely on information conveyed by anonymous 911 callers." *United States v. Holloway*, 290 F.3d 1331, 1339 (11th Cir. 2002).

Those three factors made the tip reliable on its own, without the police independently seeing any criminal activity. The same was true in *Navarette*, where the police never saw the reckless driving that the tipster alleged. *See* 572 U.S. at 403–04; s*ee also United States v. McCants*, 952 F.3d 416, 423 (3d Cir. 2020) ("The absence of corroborative evidence, the Court held, did not negate the reasonable suspicion created by the 911 call." (citing *Navarette*, 572 U.S. at 403–04)). To be sure, if a tip is not trustworthy on its own or "has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *White*, 496 U.S. at 330. Here, though, police could depend on the tip for purposes of a short investigative stop—especially because the stakes were so high with the report of a heated exchange and fear of a gunfight. *Cf. Holloway*, 290 F.3d at 1339 ("[W]hen an *emergency* is reported by an anonymous caller, the need for immediate action may outweigh the need to verify the reliability of the caller." (emphasis in original)).

8

2.

A trustworthy tip, though, is not always enough: "Even a reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'" *Navarette*, 572 U.S. at 401 (quoting *Terry*, 392 U.S. at 30). The tip in this case does just that. There is no doubt, we think, that police could have performed an investigative stop if Bruce had been gesturing with his firearm during a heated argument when they arrived. The question is whether the reasonable suspicion generated by the reliable tip had dissipated by the time the officers arrived on the scene. And the answer is no.

It was not unreasonable for the officers to suspect that the two men who were sitting in a car that matched the vehicle described in the tip, at an address that matched the location provided in the tip, could be the same two men that had been engaged in the violent argument described in the tip. Nor was it unreasonable for the 911 caller, and then the officers, to think that a man gripping a gun and arguing at 3:30 a.m. had engaged in criminal activity, or was about to. Although the 911 dispatcher never warned the officers of an impending shooting, he did not need to do so for them to have reasonable suspicion. Police officers, of all people, know that loud arguments and drawn guns don't mix well, and they could reasonably conclude that those two ingredients were a recipe for violent crime. The fact that the argument took place in a high-crime area only underscored that suspicion. *See*

9

*Lewis*, 674 F.3d at 1309 (relevant that the activity "took place at night in a high crime area").

The "absence of additional suspicious conduct" when the police arrived did not "dispel the reasonable suspicion" of criminal activity. *Navarette*, 572 U.S. at 403. That's no surprise; those engaged in criminal activity would rationally be inspired to hide it at the first sign of police. *See id.* It is thus hardly remarkable that Bruce was not wielding a gun in a shouting match when the police arrived with their flashing lights. And although the dissent finds it unreasonable to conclude that both men would "agree to 'press pause' on their hostilities and sit together in a car," the dissent's take misunderstands the persuasive power of a gun. Dissenting Op. at 24. Consider, for instance, a domestic-violence victim or a hostage at gunpoint who has been ordered to act naturally, or even to tell responding officers that everything is okay. When officers arrived on the scene here, nothing they saw undercut the reasonable suspicion they had already formed based on the reliable 911 call. Not the movement of the two men from outside to inside the car—a new position that would make them less visible to the police— and not the scene's apparent calm. If anything, those changes are entirely consistent with a hostage-type situation.

So it is true that the officers did not see Bruce acting unlawfully—but it is also true that they did not need to. The Supreme Court has "firmly rejected the argument 'that reasonable cause for an investigative stop can only be based on the officer's personal observation, rather than on information supplied by another

10

person.'" *Id.* at 397 (punctuation omitted) (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)).

Apparently overlooking this holding, our dissenting colleague's analysis, at its core, depends on accepting the very rule that the Supreme Court has already rejected. For the dissent, any reasonable suspicion of a violent altercation here "should have dissipated when the officers arrived at the scene and saw nothing of the sort." Dissenting Op. at 19. Under that reasoning, however, *Navarette* would have come out differently because the police did not see anything resembling drunk driving. The dissent says that, unlike drunk driving, an armed dispute "is not obviously disguisable." *Id.* at 20. Respectfully, we disagree. If the drunk driver could have driven safely and without exhibiting any signs of impairment, we presume that the driver would have done so in the first place. But the chemical impact of alcohol on the body is not a mind-over-matter issue. Moving a few feet to sit in a car, however, is easily handled; in fact, it would be a wise move for someone attempting to avoid attention from the police in the middle of the night. The Supreme Court's firm rejection of a police-observation rule cannot be dodged so easily.

The truth is that no one needed to see criminal activity: reasonable suspicion "may be formed by observing exclusively legal activity." *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (citation omitted). And law enforcement "need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). Given the tip's reliability, which has already been established, the officers were not required to forget why they had been called to the

11

scene.  Whatever innocent conduct could explain arguing, gun-in-hand, at 3:30 in the morning, does not negate the officers' reasonable suspicion.  They had "at least a minimal level of objective justification" for stopping Bruce for investigative purposes.  *Wardlow*, 528 U.S. at 123.

Bruce objects that, even if the police reasonably suspected that someone had committed a crime, they could not have reasonably suspected that he was that someone.  But it is not as if police picked Bruce out of a crowded scene; when the officers approached the area immediately after the tip, there were only two people in the white car at the address given.  A less specific tip certainly might lead to a different result.  On these facts, though, the police had reasonable suspicion to briefly hold both Bruce and his associate.

Once officers reasonably suspect crime, the reasonableness of their "decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques."  *Navarette*, 572 U.S. at 404 (quoting *United States v. Sokolow*, 490 U.S. 1, 11 (1989)).  To ignore that rule here would be "particularly inappropriate" because of the "disastrous consequences" posed by armed conflict.  *Id.*  It would leave officers with only two constitutional options: avoid responding to the emergency 911 call or approach the scene without tools to control it.

Neither of these is required by the Fourth Amendment.  Waiting to see if the apparently dormant scene erupted with gunfire or some other hostility would endanger the public—including the other person in the car.  And recall that the officers were not sneaky in their approach; they showed up with lights flashing, which would likely inspire a pause in any criminal activity until they had

12

abandoned the scene.  So waiting and watching was not a feasible approach under these circumstances.  On the other hand, approaching the white car without at least limited authority to contain the potential threat could risk the officers' lives.  As we have said in another context, "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."  *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007).  In response to both of these suggestions, our answer is the same: "We think the police need not have taken that chance and hoped for the best."  *Scott v. Harris*, 550 U.S. 372, 385 (2007).

Sometimes tipster cases are close.  But this one is not.  Reasonable suspicion "depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  *Navarette*, 572 U.S. at 402 (quotation marks and citation omitted).  Officers need not—and should not—turn a blind eye to commonsense concerns of danger when responding to an emergency 911 call.  Nor should we when analyzing the circumstances.  *See id.* "Law enforcement officers are at greatest risk when dealing with potentially armed individuals because they are the first to confront this perilous and unpredictable situation."  *United States v. Gibson*, 64 F.3d 617, 624 (11th Cir. 1995).  The "very rationale underpinning *Terry*—the protection of officer safety and the safety of others nearby, especially from the dangers posed by firearms—is presented by the facts of this case."  *Lewis*, 674 F.3d at 1309.  The officers had reasonable suspicion to perform an investigatory stop.

13

B.

Bruce advances one more argument—that the officers needed probable cause, rather than reasonable suspicion, because they stopped him on the curtilage of a home. The parties debate whether Bruce actually reserved the right to appeal this issue when he conditionally pleaded guilty, but we need not decide that point. At the very least, Bruce failed to raise the issue below, so he must—but cannot— establish plain error. *See Young*, 350 F.3d at 1305.

Curtilage is an area near and closely associated with the home; at the founding, it was considered part of the house for Fourth Amendment purposes. *See Collins v. Virginia*, 138 S. Ct. 1663, 1676 (2018) (Thomas, J., concurring) (citing 4 William Blackstone, *Commentaries on the Laws of England* 225 (1769)). The most recent Supreme Court case on the issue (and the one Bruce leans on to show plain error) is *Collins v. Virginia*. There, the Court held that the automobile exception to the Fourth Amendment does not permit a police officer, "uninvited and without a warrant, to enter the curtilage of a home in order to search a vehicle parked therein." *Id.* at 1668 (majority opinion). The decision was limited though. As the Court explained, *Collins* was materially different from a case in which the record did not indicate any Fourth Amendment interest in the place where the vehicle was parked and in which the record offered no "determination that the driveway was curtilage." *Id.* at 1674.

Those distinctions devastate Bruce's attempt to rely on *Collins*. By his own admission, the "record does not disclose Mr. Bruce's relationship to the house" where he was stopped. The record also lacks important detail needed to sort out if

14

the property was within anyone's curtilage.  That question turns on four fact-intensive inquiries: "(1) the proximity of the area claimed to be curtilage to the home; (2) the nature of the uses to which the area is put; (3) whether the area is included within an enclosure surrounding the home; and, (4) the steps the resident takes to protect the area from observation."  *United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir. 2006).  All we know on appeal is the location where the white car was parked, and that the area was not enclosed.  We know nothing about the other two factors.  These sparse details are just not enough.

In a last-ditch effort, Bruce asks us to remand for factfinding on this issue.  But doing so "would undermine the plain-error doctrine," which is designed to encourage parties to raise issues in the district court.  *United States v. Cabezas-Montano*, 949 F.3d 567, 592 (11th Cir. 2020).  On the record before us, then, Bruce has not established plain error.

*    *    *

Officers cannot stop people for no reason.  Or for a bad reason.  But here, they had a very good reason—a reliable tip describing an imminent gunfight.  We will not ask police to forget what they already know when they approach a potential crime scene.  A contrary decision would put not only police, but the public in danger.  Under the circumstances here, it was reasonable for them to suspect Bruce of criminal activity and to proceed with caution.  We therefore **AFFIRM**.

15

MARTIN, Circuit Judge, dissenting:

This case asks us to decide whether officers violated Toddrey Bruce's Fourth Amendment right to be free from unreasonable seizures when they stopped him on the basis of an anonymous tip. I agree with the majority's conclusion that under the Supreme Court's ruling in Navarette v. California, 572 U.S. 393, 134 S. Ct. 1683 (2014), we must accept the anonymous tip in this case as reliable. Maj. Op. at 8. But as the majority recognizes, id. at 9, even when we accept the tip as reliable, we must also assess whether the police had the reasonable and particularized suspicion of criminal activity necessary to justify an investigatory stop. See Navarette, 572 U.S. at 401, 134 S. Ct. at 1690. To the extent the anonymous tip here provided officers with reasonable suspicion, it is my view that any such reasonable suspicion should have dissipated upon the officers' arrival at the reported address. I therefore respectfully dissent from the majority's opinion affirming the District Court's denial of Mr. Bruce's motion to suppress.

While the majority's recitation of the facts is accurate, I recount them briefly in order to highlight one important matter. It is true, as the majority writes, that an anonymous caller told a 911 operator that he witnessed an argument taking place in the front yard of what he referred to as a "drug house." It is also true that the caller said the individuals arguing "might be shooting any minute from now," and warned the operator that officers "have to be careful." It is important to our legal

16

analysis to know, however, that the 911 dispatcher did not relay any of these details to the officers who went to the scene of the reported altercation. Rather, the officers had only a barebones report from dispatch that there was an "an argument in the front yard [of the reported address] with a black male standing next to a white vehicle holding a handgun."

Dispatch's failure to give the officers the full details of the anonymous tip is significant because we are required to judge whether an officer has reasonable suspicion to conduct a stop based on "the facts available to the officer at the moment of the seizure or the search." See United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) (quotation marks omitted); see also United States v. Colon, 250 F.3d 130, 132, 138 (2d Cir. 2001) (holding information provided by anonymous 911 caller to civilian operator but not provided to arresting officers could not retroactively create reasonable suspicion). For that reason, the question of whether the officers had reasonable suspicion to stop Mr. Bruce must be determined based on the following circumstances: (1) officers received a dispatch concerning an "argument" in which one of the parties had a gun and stood next to a white car; (2) the report was made in the middle of the night, and concerned activity in a high-crime neighborhood; and (3) when officers arrived at the reported address, they saw two men sitting in the white car with the headlamp on.

17

An investigatory stop "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." United States v. Cortez, 449 U.S. 411, 417, 101 S. Ct. 690, 695 (1981). And in determining whether reasonable suspicion exists, courts consider the "the totality of the circumstances." Id. Once reasonable suspicion is established, it does not exist in perpetuity; rather, an investigative stop must "cease once law enforcement's reasonable, articulable suspicions . . . [are] allayed." Croom v. Balkwill, 645 F.3d 1240, 1251 n.15 (11th Cir. 2011) (per curiam).

Had police, upon arriving at the reported address, observed two people having an argument, with one of the parties holding a gun, I would have no question that reasonable suspicion would have justified an investigatory stop. See United States v. Holloway, 290 F.3d 1331, 1337–38 (11th Cir. 2002) (holding that emergency situations involving endangerment to life provide probable cause for police intervention). But when police arrived at the reported address, they did not witness a violent argument or any other emergency. No one was in the front yard causing a disturbance, and no one stood next to the white car brandishing a handgun. In fact, no one was standing anywhere. The officers' sole observation upon their arrival was a white car, with two people inside, parked in the driveway of the house. The officers did not testify to hearing a commotion or other disturbance coming from the vehicle. Nevertheless, the officers immediately

18

initiated a stop by getting out of their patrol cars and approaching the parked car with their weapons drawn.[1]

On these facts, even if dispatch's report gave the officers reasonable suspicion that a violent altercation was ongoing or imminent, any such reasonable suspicion should have dissipated when the officers arrived at the scene and saw nothing of the sort.  See United States v. Watson, 900 F.3d 892, 896 (7th Cir. 2018) (holding that officers did not have reasonable suspicion based on anonymous tip that "boys" were "playing with guns" because when officers arrived and observed only that "men were seated inside the identified car with no guns in sight," any concern about an emergency "should have dissipated").  In fact, what these officers saw upon arriving at the address should have suggested the opposite of what was reported in the tip.  The two men at the scene were not fighting, but were instead sitting together in a car.

The majority opinion holds the officers still had reasonable suspicion upon arriving at the reported address.  It recites the principle that the absence of additional suspicious conduct does not necessarily dispel reasonable suspicion.  Maj. Op. at 9–10.  An accurate statement of the law, no doubt, but one that begs the question, reasonable suspicion of what?  In the Supreme Court's Navarette

---

[1] The parties do not dispute that the officers initiated the stop when they approached the white car with their weapons drawn.

decision, which the majority relies on for this proposition, an anonymous tipster complained of being driven off the road by another vehicle, thus causing officers to have a reasonable suspicion that the other vehicle's driver was intoxicated. Navarette, 572 U.S. at 403–04, 134 S. Ct. at 1691–92.  When officers finally caught up to the reported vehicle, they followed it for five minutes without observing any driving irregularities.  Id. at 403–04, 134 S. Ct. at 1691.  The Court held that the officers nevertheless had reasonable suspicion because it was "hardly surprising" that an intoxicated driver would operate his vehicle more carefully while being followed by a marked police vehicle.  Id. at 403, 134 S. Ct. at 1691. Here, by contrast, dispatch reported that an argument was taking place, and one of the parties had a gun.  Unlike a drunk driver, who manages to conceal his drunkenness for a period of time, an ongoing violent conflict is not obviously disguisable.

The majority says my conclusion that reasonable suspicion should have dissipated here is at odds with the rule that reasonable suspicion need not be based on an officer's personal observations.  Maj. Op. at 10–11 (citing Navarette, 572 U.S. at 397, 134 S. Ct. at 1688).  Thus, the majority contends, my analysis "at its core" is at odds with Navarette.  Maj. Op. at 11.  Respectfully, the majority misunderstands my analysis, and overstates the holding in Navarette.  I do not suggest that reasonable suspicion cannot be supplied by a third party, such as an

anonymous tipster. Indeed, I have assumed for the purposes of my analysis that the tip here did furnish reasonable suspicion. See supra at 19. But just as reasonable suspicion may be formed, it may also be dispelled. Kansas v. Glover, 589 U.S. ___, 140 S. Ct. 1183, 1191 (2020) (observing that, because a stop must be "justified at its inception," the "presence of additional facts might dispel reasonable suspicion"). Contrary to the suggestion of the majority opinion, Navarette did not renounce this principle. While the Court held that operating a vehicle carefully for a short time does not dispel reasonable suspicion of drunk driving, it also explained that "[e]xtended observation of an allegedly drunk driver might eventually dispel a reasonable suspicion of intoxication." Navarette, 572 U.S. at 403–04, 134 S. Ct. at 1691. And in my view, what the officers observed here—unlike what the officer saw in Navarette—should have dispelled any reasonable suspicion of criminal activity.[2]

---

[2] As I've stated above, the circumstances of this case are distinguishable from Navarette because, while it might be reasonable to think that a driver has masked his intoxication for a short time, it was unreasonable to suspect that the parties here had concealed their armed conflict. The majority disagrees. It says drunk driving is not disguisable because the impact of alcohol "is not a mind-over-matter issue," whereas "[m]oving a few feet to sit in a car . . . is easily handled." Maj. Op. at 11. First, by characterizing drunk driving in this way, the majority seems to endorse a view that the Court rejected in Navarette. Compare 572 U.S. at 403, 134 S. Ct. at 1691 ("It is hardly surprising that the appearance of a marked police car would inspire more careful driving.") with 572 U.S. at 413, 134 S. Ct. at 1697 (Scalia, J., dissenting) ("[T]he dangers of intoxicated driving are the intoxicant's impairing effects on the body—effects that no mere act of the will can resist."). Beyond that, the majority's emphasis on how easy (or how difficult) it is to enter a car is misplaced. In determining whether these officers still had reasonable suspicion upon arriving at the reported address, the question is not whether the individuals described in the dispatch had the physical capability to enter a car. I assume the answer is yes, since they had been reported to be standing next to the car. Instead, the question that is relevant to our analysis

21

The majority posits two hypothetical scenarios to explain why two individuals sitting together in a car—without any sign of argument—nevertheless provides reasonable suspicion of an ongoing or impending violent conflict. The first is that the officers might have believed that one of the people in the car was a "domestic-violence victim." Maj. Op. at 10. Had the tipster here reported a domestic violence incident, and had dispatch relayed that information to the reporting officers, the majority's hypothetical might have some force. As our sister circuits have recognized, "domestic violence comes and goes," so the absence of violence does not exclude its possible recurrence. See, e.g., United States v. McCants, 952 F.3d 416, 424 (3d Cir. 2020) (quotation marks omitted). But that principle is irrelevant here, because neither the anonymous tip nor the dispatcher's communication even hinted that the disturbance at issue involved a domestic conflict.

Neither does the barebones report of an "argument" involving a man with a handgun support the majority's second hypothetical: that the men arguing on the front yard relocated to the parked car because their confrontation evolved into a hostage crisis. Maj. Op. at 10. To start, the officers never testified that they suspected a hostage situation, and the government never argued as much in the

---

is whether it was reasonable for arresting officers to suspect that two people in a violent conflict decided to cease their hostilities and sit quietly together in a car. I think not.

22

District Court.  And even if they had, the notion that two people sitting together in a car is really a hostage situation is precisely the type of "hunch of criminal activity" that cannot support reasonable suspicion.  United States v. Perkins, 348 F.3d 965, 970 (11th Cir. 2003) (quotation marks omitted); see also United States v. Slocumb, 804 F.3d 677, 684 (4th Cir. 2015) (declining to "use whatever facts are present, no matter how innocent, as indicia of suspicious activity" (alteration adopted) (quotation marks omitted)).[3]

Finally, I disagree with the majority's suggestion that we must find reasonable suspicion here or else officers facing these circumstances will be left with the following dilemma: "avoid responding to the emergency 911 call or approach the scene without tools to control it."  Maj. Op. at 12.  These officers had other options.  For one, they could have observed the car for some period of time to see if the occupants' conduct gave rise to reasonable suspicion.  The majority says this option is not realistic for two reasons: (1) waiting until the apparently dormant scene erupted with hostilities "would endanger the public—including the other person in the car"; and (2) because the officers "showed up with [their

---

[3] The majority says that by rejecting its hostage and domestic-violence hypotheticals, I "misunderstand[] the persuasive power of a gun."  Maj. Op. at 10.  To the contrary, I agree that guns may spell danger under certain circumstances.  However, the presence of a gun does not give courts license to conceive of any possible scenario, however unsupported by the record, to find the reasonable suspicion necessary to justify a search.  Cf. Watson, 900 F.3d at 896 ("[A] mere possibility of unlawful use of a gun is not sufficient to establish reasonable suspicion." (quotation marks omitted)).

police] lights flashing," the people at the scene likely would have "pause[d] . . . any criminal activity." Id. The former reason is unpersuasive because, as I have set out above, nothing the officers observed upon arriving at the reported address should have suggested that a violent conflict was imminent. The latter reason is unrealistic because the only "criminal activity" reported by dispatch was an armed conflict, and it is hardly reasonable to believe that the officers' arrival would have inspired the two men to agree to "press pause" on their hostilities and sit together in a car.

Another option for the officers would have been to conduct a consensual encounter, by approaching the vehicle and questioning its occupants. The majority discounts this option as well because law enforcement "are at greatest risk when dealing with potentially armed individuals." Maj. Op. at 13 (quoting United States v. Gibson, 64 F.3d 617, 624 (11th Cir. 1995)). I don't take issue with that proposition, but the mere presence of a firearm does not, by default, give police the right to conduct an investigatory stop. In Florida v. J.L., 529 U.S. 266, 120 S. Ct. 1375 (2000), the Supreme Court rejected a proposed "firearm exception" to the reasonable suspicion rule. Id. at 272–73, 120 S. Ct. at 1379–80. It held that, although "[f]irearms are dangerous, and extraordinary dangers sometimes justify unusual precautions," the rule allowing investigatory stops on the basis of reasonable suspicion was designed precisely to balance the majority's safety

24

concerns with the Fourth Amendment right to be free from unreasonable searches and seizures.  Id. at 272, 120 S. Ct. at 1379.  I fear the majority's conclusion that police could not have conducted a consensual encounter here due to the potential presence of a gun inches us ever closer to the "firearm exception" expressly rejected in J.L.

For these reasons, I would reverse the District Court's decision to deny Mr. Bruce's motion to suppress, and by extension, vacate Mr. Bruce's conviction and sentence.  I respectfully dissent.