[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13861

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

STEVEN DEWAYNE BARNES, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 2:22-cr-00118-SPC-NPM-1

_____

Before WILSON, JILL PRYOR, and BRASHER, Circuit Judges.

PER CURIAM:

Defendant-Appellant Steven Dewayne Barnes, Jr. appeals his convictions and 120-month sentence for possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g), and possessing a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k). First, Barnes argues that the district court erred in denying his motion to suppress the handgun because police officers obtained it using an unconstitutional stop and pat down search. Second, he argues that the application of a four-level sentencing enhancement under U.S.S.G. § 2K2.1(b)(6)(B) was impermissible double counting and violated his Second Amendment rights. After careful consideration, we affirm the district court.

**I.**

We turn first to the encounter on the streets of Fort Myers that led to Barnes' Fourth Amendment challenge and motion to suppress.[1] On the day of Barnes' arrest, he was walking down the street toward his home when two Fort Myers Police Department (FMPD) Group Violence Intervention Unit officers approached him in a marked patrol car. Witnesses had named Barnes as a suspect in two recent drive-by-shootings—one of which occurred the

---

[1] The following reflects the district court's findings after hearing both officers' testimony, finding it credible, and watching the body camera footage of the incident.

night before. The two officers were patrolling the area, trying to find out where Barnes was living. Both officers were very familiar with Barnes, had encountered him before, and knew he was a felon.[2] One of the officers, Sergeant Sanders, testified he had "lots of conversations" with Barnes over the last eight to ten years and had monitored Barnes as a juvenile probation officer.

When Sergeant Sanders saw Barnes, he stopped beside him, rolled down the window, and greeted him. He did not activate the car's lights or sirens. Barnes walked up to the driver's side of the patrol car, and they began a casual conversation. Sanders congratulated Barnes on finishing probation and asked Barnes about his mother's health, his child, and his brother. At the beginning of the conversation, Sanders' K9 partner, Balor, barked loudly from the back seat, and Sanders tried to quiet him down. Once, Balor had bitten Barnes while helping to arrest him. Since then, Sergeant Sanders had other conversations with Barnes with Balor in the car and Barnes did not appear nervous.

On this particular day, both officers noticed Barnes' uncharacteristically nervous body language and demeanor. When they first saw him, Barnes was walking down the street normally, carrying a grocery bag, with both arms moving freely. But the entire

---

[2] Barnes had been convicted of the following felonies in Lee County Circuit Court: (1) Resisting an Officer with Violence, Possession of a Weapon School Property, and Carrying a Concealed Firearm on September 28, 2015; (2) Possession of Cannabis with Intent to Sell on November 13, 2017; and (3) Fleeing or Attempting to Elude a Law Enforcement Officer on July 15, 2019.

time he spoke with the officers, he kept his left arm pressed firmly against his left hip, in what the officers described as an unnatural and awkward position. His hands and knees were visibly shaking. When Barnes held up his cell phone to show the officers a video, the two officers got out of the car and stood on either side of him to watch. Even when he took out his phone, Barnes' left arm stayed pressed against his side. His right hand and legs continued shaking.

Based on his prior interactions with Barnes, Sergeant Sanders suspected Barnes was carrying a concealed weapon. He asked Barnes if he had a gun. Barnes immediately looked down to his left side, directly to where he had been pressing his arm. At this time, the other officer, Detective Birch, saw a bulge in Barnes' waistline. The officers grabbed Barnes' arms. Sergeant Sanders patted down the left side of Barnes' body. He felt the grip of a firearm from outside Barnes' clothing and removed a loaded handgun concealed in his waistband. The officers then put Barnes in handcuffs. After the arrest, Barnes told Detective Birch that he could have just walked across the parking lot to his house rather than stop to speak with the officers. Detective Birch agreed.

A federal grand jury indicted Barnes for two counts of unlawful possession of a firearm under 18 U.S.C. § 922. He moved to suppress evidence of the gun. The district court denied the motion; it found that the encounter was a consensual police-citizen interaction until the officers grabbed Barnes' arms, and that the officers developed reasonable suspicion that Barnes was illegally carrying a firearm before their search and seizure of his person.

A.

In reviewing a district court's denial of a motion to suppress, we review its "findings of fact for clear error and its application of the law to those facts *de novo*." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). We construe all facts in the light most favorable to the party that prevailed in the district court. *United States v. Morley*, 99 F.4th 1328, 1336 (11th Cir. 2024).

A factual finding is clearly erroneous only if, after reviewing all the evidence, we have a "definite and firm conviction" that the district court made a mistake. *United States v. Villarreal*, 613 F.3d 1344, 1349 (11th Cir. 2010) (quotation marks omitted). We afford substantial deference to the district court's credibility determination "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *United States v. Holt*, 777 F.3d 1234, 1255 (11th Cir. 2015) (quotation marks omitted).

B.

The Fourth Amendment safeguards the rights of the people to be free from unreasonable searches and seizures. U.S. Const. amend. IV. Not all interactions between police officers and citizens are "seizures" for Fourth Amendment purposes. *See Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). Law enforcement officers do not violate the Fourth Amendment "merely by approaching individuals on the street or in other public places" and asking questions. *United States v. Drayton*, 536 U.S. 194, 200 (2002). A brief, consensual and non-

coercive interaction does not require Fourth Amendment scrutiny. *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).

An interaction only becomes a seizure when the police "exert a show of authority that communicates to the individual that his liberty is restrained, meaning he is not free to leave." *United States v. Baker*, 290 F.3d 1276, 1278 (11th Cir. 2002). "The societal pressure to stop and speak with law enforcement is not a sufficient restraint of liberty to raise the interaction to a level that requires constitutional protection." *Id*. Nor does "the very presence of a police car" driving parallel to a pedestrian. *Michigan v. Chesternut*, 486 U.S. 567, 575 (1988). So long as a reasonable person would feel free "to disregard the police and go about his business," the encounter is consensual. *California v. Hodari D.*, 499 U.S. 621, 628 (1991).

In determining whether a police-citizen encounter was a seizure, we consider:

> whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

*United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (quotation marks omitted).

The Fourth Amendment does not prohibit a police officer from briefly detaining a person, even without probable cause to

make an arrest, if they have a reasonable suspicion based on objective facts that the person has engaged in criminal activity. *United States v. Bruce*, 977 F.3d 1112, 1116 (11th Cir. 2020). Reasonable suspicion does not require the observation of illegal conduct, *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012), but does require "at least a minimal level of objective justification" for making an investigatory stop. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The stop must be based on "specific, articulable facts and rational inferences." *United States v. Briggman*, 931 F.2d 705, 709 (11th Cir. 1991).

After legally stopping an individual, a law enforcement officer, for his own protection and safety, may conduct a pat down to find weapons that he reasonably suspects are in the individual's possession. *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979). If an officer feels a concealed object that he reasonably believes may be a weapon, he may continue the search beyond the outer clothing and remove the concealed object. *United States v. Johnson*, 921 F.3d 991, 997 (11th Cir. 2019) (en banc). Definitive evidence of a weapon or an absolute certainty that the individual is armed is not required. *United States v. Bishop*, 940 F.3d 1242, 1248 (11th Cir. 2019).

In the reasonable suspicion inquiry, "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks omitted).

An officer may assess the situation "in light of his specialized training and familiarity with the customs of the area's inhabitants." *Id.* at 276. When "viewed in totality with the other relevant factors, knowledge of a defendant's criminal history could cause a reasonable officer to have heightened safety concerns." *Bishop*, 940 F.3d at 1249 n.4. The presence of "a visible, suspicious bulge" in an individual's clothing may also give rise to reasonable suspicion, particularly when the individual is present in a high-crime area. *Jordan*, 635 F.3d at 1187.

Nervous and evasive behavior is a "pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. While a certain level of nervousness is to be expected during encounters with the police, a suspect's shaking and acting extremely or abnormally nervous is a valid consideration. *See, e.g.*, *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991); *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003).

Our first task is to establish at what point in Barnes' encounter the Fourth Amendment becomes relevant, that is, when the officers 'seized' Barnes. *See Terry*, 392 U.S. at 16. Neither party appears to meaningfully dispute the district court's conclusion that Barnes was not seized until the officers physically restrained him and removed the firearm.[3] We agree that the initial conversation

---

[3] Barnes' opening brief expressly claims that he was seized when the officers placed their hands on him. But it also alludes to the fact that Barnes did not feel free to leave during the initial conversation, stating he "chose to

between Barnes and the officers was a consensual citizen-officer interaction—not a seizure. *See Jordan*, 635 F.3d at 1186. Until the officers made physical contact, there was no "show of authority" telling Barnes he was not "free to leave." *Baker*, 290 F.3d at 1278.

The two officers drove up to Barnes as he was walking down the street and called out to him. The two officers were sitting in the vehicle when Barnes approached the patrol car on his own. The car pulled into a parking lot and was not positioned in a way that blocked Barnes' path of travel toward his apartment complex. The officers did not activate the patrol car's lights or sirens. Instead, the officers spoke to Barnes in a casual manner through an open car window, asking questions about how he and his family were doing. The officers did not ask for any type of identification because they were very familiar with Barnes.

Barnes argues he was fearful of Balor, the K-9 officer, who was barking from the back seat when Barnes first approached the car. But Sanders quieted him down quickly, and for the entire conversation, the dog remained secured in the back seat. Neither officer got out of the car and approached Barnes until he invited them

participate" in a discussion with uniformed officers, possessing firearms, with a K-9 in their vehicle, "out of fear of what might happen if he refused."

While we recognize the complex power dynamics at play, our case law is clear that any "societal pressure" Barnes felt in this moment to stop and speak with the officers does not raise the interaction to a level requiring constitutional protection. *See Baker*, 290 F.3d at 1278. Driving next to Barnes in a police car, being uniformed, and possessing weapons also hold little weight in the analysis. *Drayton*, 536 U.S. at 204; *Michigan*, 486 U.S. at 575.

to look at a video on his cell phone. After the arrest, Barnes said that he could have just walked into his house rather than stop and talk to the officers, and Detective Birch agreed.

By the time Barnes was seized and searched, the officers had reasonable suspicion based on their own experience and specialized training that he was illegally carrying a concealed weapon. *See Jordan*, 635 F.3d at 1187. Both officers served on the FMPD for more than ten years and were familiar with the area. *See Arvizu*, 534 U.S. at 276. The officers also knew that Barnes had been named as a suspect in two drive-by shootings in the area, including one that occurred about twelve hours prior. They were familiar with Barnes' criminal history and had apprehended him on at least one prior occasion. As Barnes had been convicted of resisting an officer with violence and fleeing a law enforcement officer, this record could reasonably cause them to have heightened safety concerns. *Bishop*, 940 F.3d at 1249 n.4.

The officers were also familiar with Barnes' mannerisms. Sergeant Sanders had many conversations with Barnes in the past, including other conversations where Balor was present. He noted that Barnes' body language was unusual, and Barnes exhibited an extreme level of nervousness during this interaction. On the officers' body-worn camera video, after Barnes is in handcuffs, Sergeant Sanders articulates the same "objective and concrete facts" that made him suspicious that Barnes was carrying a weapon. He tells Barnes, "I was talking to you, man, things were cool, and then you

started taking your left hand and pushing it against that gun. Your knees were shaking so bad you about fell over."

The body-worn camera footage reveals that Sergeant Sanders kept his eyes on the left side of Barnes' body, which is also where he limited his search. Detective Birch testified that he saw a bulge in the left-side of Barnes' waistband. *See Jordan*, 635 F.3d at 1187. This was the same side where Barnes was pressing his arm and where he looked down when Sanders asked if he had a gun. Although Barnes contends that the body-camera videos are inconsistent with the officers' statements that he was shaking and visibly nervous and do not show a bulge, the videos do not directly contradict the officers' testimony. Barnes is not visible in most of the videos. The portions where he is visible do not clearly show that he was not shaking, and there is also a slight bulge underneath Barmes' sweatpants pocket visible on Officer Birch's camera footage when he approaches Barnes. As a result, we do not have a definite and firm conviction the district court made a mistake. *Villarreal*, 613 F.3d at 1349.

Barnes also argues that when Sanders asked if he had a gun, and he glanced down to his left side, he could have been looking at Detective Birch's body camera which beeped and vibrated at the same time, or to a notification on his cell phone. First, Barnes looked down to his left side, where the gun was hidden, while he was holding his cell phone in his right hand and Birch stood on his right side. More importantly, these alternate explanations do not change the "whole picture" of the encounter. Barnes' glance to his

left side when he was asked about having a gun, combined with his uncharacteristically nervous and evasive body language, and the bulge in his pocket created more than a "minimal level of objective justification" to conduct a *Terry* stop and search for potential firearms. *Wardlow*, 528 U.S. at 123. Accordingly, we affirm the district court's denial of Barnes' motion to suppress.

## II.

We turn next to Barnes' appeal of his sentence. For his conviction for unlawful firearm possession under 18 U.S.C. § 922, Barnes received a base offense level of 24, because he "committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(2).

The guidelines call for a four-level increase if the defendant "used or possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B). The district court applied the enhancement at the government's request because Barnes possessed the firearm while committing the Florida third-degree felony of unlawfully carrying a concealed firearm. *See* Fla. Stat. § 790.01(3). Barnes argues that this enhancement resulted in impermissible double counting and violated his Second Amendment rights. We address each argument in turn.

### A.

"We review de novo the interpretation and application of the Sentencing Guidelines." *United States v. Cingari*, 952 F.3d 1301, 1305 (11th Cir. 2020). This includes a claim of double counting.

*United States v. Dudley*, 463 F.3d 1221, 1226 (11th Cir. 2006). We also review the constitutionality of the Sentencing Guidelines de novo. *United States v. Matchett*, 802 F.3d 1185, 1191 (11th Cir. 2015).

B.

"Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Osorto*, 995 F.3d 801, 822 (11th Cir. 2021) (quotation marks omitted). Punishment of two kinds of harms based on the same conduct is permissible under the Guidelines when "neither enhancement fully accounts for both harms." *United States v. Asante*, 782 F.3d 639, 648 (11th Cir. 2015) (quotation marks omitted and alteration adopted). "We presume that the [Sentencing] Commission intended to apply separate sections cumulatively unless otherwise specified." *United States v. Flanders*, 752 F.3d 1317, 1340 (11th Cir. 2014).

The enhancement under U.S.S.G. § 2K2.1(b)(6)(B) applies if the sentencing court finds "the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." *United States v. Bishop*, 940 F.3d 1242, 1250 (11th Cir. 2019) (quotation marks omitted). "Another felony offense" is "any federal, state or local offense other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding

one year, regardless of whether a criminal charge was brought, or a conviction obtained." U.S.S.G. § 2K2.1, cmt. 14(C).[4]

The government argued, and the district court agreed that the four-level enhancement should apply because Barnes was committing the Florida felony offense of illegally carrying a concealed weapon while he was committing the federal crime of felon in possession of a firearm. According to Barnes, enhancing his sentence for concealing the same firearm he was convicted of possessing punishes him twice for the same harm. We disagree. While the underlying conduct involves the same firearm, the conduct for which Barnes was convicted is distinct from the conduct on which the enhancement was based. *See United States v. Jackson*, 276 F.3d 1231, 1234 (11th Cir. 2001).

Section 922(g)(1) prohibits "anyone who has been convicted of a crime punishable by more than one year of imprisonment" from keeping a firearm or ammunition. The statute requires the government to prove the defendant (1) knew he possessed a firearm, and (2) knew he belonged to the relevant category of persons barred from possessing said firearm. *Rehaif v. United States*, 588 U.S. 225, 237 (2019). Under § 922(k), the government must prove the defendant (1) possessed a gun with an obliterated serial number

---

[4] A sentencing court may consider the Sentencing Commission's interpretation of a Guideline as contained in the Commentary to the extent that a Guideline is "genuinely ambiguous." *United States v. Dupree*, 57 F.4th 1269, 1279 (11th Cir. 2023) (en banc).

and (2) knew the number was obliterated. *United States v. Haile*, 685 F.3d 1211, 1220 (11th Cir. 2012) (per curiam).

The felony offense possessing the firearm "facilitated" was carrying a concealed weapon in violation of Florida Statutes § 790.01(3). The law is "designed to prevent a person with a weapon from taking some undue advantage over an unsuspecting adversary, who is not aware that the person is carrying a weapon." *Dorelus v. State*, 747 So. 2d 368, 370 (Fla. 1999) (quotation marks omitted). The prosecution must not only prove the defendant knowingly and unlawfully possessed a firearm, but that the firearm was concealed from ordinary sight. *See id.*

Barnes' convictions under 18 U.S.C. § 922 punish his possession of a firearm based on his *status* as a felon and the fact the gun had an obliterated serial number. By contrast, the Florida law punishes his *active conduct* of illegally carrying a concealed weapon. A "substantial difference—in terms of the likelihood of immediate violence flowing from the crime—exists between the offense of carrying a concealed weapon and the offense of possessing a weapon as a convicted felon." *Cf. United States v. Hall*, 77 F.3d 398, 402 n.4 (11th Cir. 1996). In carrying a concealed weapon, "the person has taken the extra step of having the weapon immediately accessible." *Id.* at 401. As the Florida felony addressed this additional harm, the district court did not err in enhancing Barnes' sentence under § 2K2.1(b)(6)(B).

## C.

Finally, Barnes argues that enhancing his sentence for possessing a concealed firearm under U.S.S.G. § 2K2.1(b)(6)(B) violates his Second Amendment rights. At its core, the Second Amendment protects the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 592, 634–35. (2008). But the right is "'not unlimited.'" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) (quoting *Heller*, 554 U.S. at 626. Many regulations, like those prohibiting possession of firearms by "'felons and the mentally ill,'" are "'presumptively lawful.'" *See, e.g.*, *United States v. Rahimi*, 144 S. Ct. 1889, 1902 (2024) (quoting *Heller*, 554 U.S. at 626, 627, n. 26). In the Eleventh Circuit, "felons are categorically 'disqualified' from exercising their Second Amendment right." *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024).

In *Bruen*, the Supreme Court introduced a new framework for analyzing Second Amendment challenges. 597 U.S. at 39. At the first step, the court must decide whether the challenged law burdens conduct protected by the plain text of the Second Amendment. *Id.* at 17, 32. If so, the government must demonstrate the restriction burdens the Second Amendment right in a way that is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 24, 30. Courts should analyze "how and why the regulations burden *a law-abiding citizen's* right to armed self-defense." *Id.* at 29 (emphasis added). *Bruen* also explained that "narrow, objective" licensing laws that are designed to ensure only that those

bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens" do not infringe on Second Amendment rights. *Id*. at 39 n.9.

Here, Barnes argues the district court erred by not conducting a historical analysis under *Bruen* before applying the §2K2.1(b)(6)(B) enhancement. But this argument fails. In *Bruen*, the Supreme Court reached the historical analysis step only after finding the Second Amendment protected the rights of the petitioners—"two ordinary, *law-abiding*, adult citizens"—to bear arms in public for self-defense. 597 U.S. at 31–33 (emphasis added). By its very terms, § 2K2.1(b)(6)(B) does not burden protected conduct by a law-abiding citizen. It penalizes an individual's possession of a firearm "in connection with" another felony offense. The enhancement applies only where the firearm "facilitated, or had the potential of facilitating, another felony offense," § 2K2.1 cmt.14(A)).

As a felon, Barnes is disqualified from Second Amendment protections "under any and all circumstances," *United States v. Rozier*, 598 F.3d 768, 770 (11th Cir. 2010). This includes illegally concealing a firearm without meeting the "narrow, objective requirements" of Florida's licensing laws, *Bruen*, 597 U.S. at 39 n.9. Even if possessing a firearm as a felon and concealing that firearm without a license is protected by the Second Amendment, regulations preventing such conduct, including the laws at issue here, are presumptively lawful. *See Rahimi*, 144 S. Ct. at 1902.

Accordingly, the district court's decision is **AFFIRMED.**