[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11408

_____

D.C. Docket No. 8:18-cr-00519-RAL-AEP-1

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

versus

JUAN CARLOS OSORTO,
a.k.a. Jose Angel Soriano-Osorto,

Defendant – Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 20, 2021)

Before MARTIN, ROSENBAUM, and TALLMAN,[*] Circuit Judges.

ROSENBAUM, Circuit Judge:

Title 8, United States Code, Section 1326(b) imposes higher maximum penalties on those who unlawfully reenter the United States if they do so after they were deported following certain types of convictions. *See* 8 U.S.C. § 1326(b). We have suggested two policies that Congress advanced when it enacted (and amended) this statute: (1) deterrence of those who have committed qualifying crimes from illegally reentering the United States, *see United States v. Adeleke*, 968 F.2d 1159, 1160–61 (11th Cir. 1992); and (2) the judgment that unlawful reentry into the United States after deportation following a qualifying conviction is a more serious crime than basic illegal reentry, *United States v. Alfaro-Zayas*, 196 F.3d 1338, 1341 n.5 (11th Cir. 1999) (per curiam). Besides these interests, the Supreme Court has also concluded that § 1326(b) addresses recidivism. *See Almendarez-Torres v. United States*, 523 U.S. 224, 230 (1998).

In line with § 1326(b), the United States Sentencing Commission issued § 2L1.2(b)(2) of the United States Sentencing Guidelines Manual ("U.S.S.G."). Before the Sentencing Commission amended that guideline in 2016, § 2L1.2(b)(2) imposed an enhancement of as much as 16 levels to the offense level for illegal-

---

[*] The Honorable Richard C. Tallman, Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

reentry offenses when the defendant had previously been convicted of a single qualifying crime (other than illegal reentry) before he was deported at an earlier time. We have held that this guideline, which echoed § 1326(b)'s enhanced penalties for illegally reentering the United States after being deported following a qualifying conviction, did not violate noncitizens' equal-protection rights. *See Adeleke*, 968 F.2d at 1161.

When we did so, the Guidelines included no offense enhancement for the very same illegal-reentry defendant if he committed the same single other crime *after* he was deported for illegal reentry but before his current illegal-reentry prosecution. So in a 2015 study, the Sentencing Commission determined that two otherwise similarly situated illegal-reentry defendants who had committed the very same other crime—one before he was deported and one after—could wind up with very different offense levels:  the sentencing range of the one who was convicted before his deportation could be as much as 23 times higher than that of the one convicted after his deportation but before his current prosecution for illegal reentry.

To more equitably reflect culpability and risk of recidivism embodied in § 1326(b), in 2016, the Sentencing Commission amended § 2L1.2(b) to decrease the maximum enhancement, in illegal reentry cases, for a pre-deportation conviction to 10 levels (§ 2L1.2(b)(2)).  At the same time, it added a new enhancement of up to

10 levels for a post-first-deportation conviction incurred before the immediate illegal-reentry offense (§ 2L1.2(b)(3)).

Defendant-Appellant Juan Carlos Osorto was convicted of illegal reentry after the 2016 Guidelines went into effect. Because he had committed other offenses both before his original deportation and after it, but before his current illegal-reentry offense, he received offense-level increases under both subsections 2L1.2(b)(2) and (3). He now challenges both subsections as violations of, among other things, his equal-protection rights. Osorto (and the Dissent) argue that these guidelines, which apply to only illegal-reentry offenses, discriminate against noncitizens by counting their prior convictions twice—once in the offense level and a second time in the Guidelines' criminal-history calculation. Meanwhile, Osorto contends, citizens cannot illegally reenter the United States, and generally, no guidelines for other offenses count prior convictions in both the offense-level and criminal-history calculations. So in Osorto's view, subsections 2L1.2(b)(2) and (3) unlawfully discriminate against noncitizens.

We disagree. First, Osorto's challenge to § 2L1.2(b)(2) is foreclosed by our binding precedent in the form of *Adeleke*. Second, Osorto (and the Dissent) consider the wrong universe of individuals. Subsections 2L1.2(b)(2) and (3) do not apply to *all* noncitizens convicted of any crime in the United States; rather, they apply to only those noncitizens who both have illegally reentered the United States and have been

convicted of other crimes. This is important because, third, through § 1326(b), Congress has determined that illegally reentering the United States after being deported following conviction on another crime is a more serious offense than simply illegally reentering the United States, and that conduct should be deterred. The challenged guidelines reflect the national interests that Congress permissibly has endorsed through its enactment and amendment of § 1326(b). Fourth, Congress has entrusted the Sentencing Commission with direct responsibility for fostering and protecting the interests of, among other things, sentencing policy that promotes deterrence and appropriately punishes culpability and risk of recidivism—the interests the Sentencing Commission cited in issuing the challenged guidelines. Finally, subsections 2L1.2(b)(2) and (3) are rationally related to the Commission's stated interests in issuing them. So after careful consideration, and with the benefit of oral argument, we must uphold the guidelines at issue and affirm Osorto's sentence.

## I. Background

Osorto pled guilty to a lone count of illegal reentry following a prior conviction for an aggravated felony, in violation of 8 U.S.C. § 1326(a) and (b)(2).

His presentence investigation report ("PSR") noted that Osorto had been convicted of two prior felonies: one before he was originally deported from the United States and one after he reentered, but before he pled guilty to the charge in

this case. Among other things, and in accordance with U.S.S.G. § 2L1.2(b)(2)(A), the PSR recommended a ten-level increase to Osorto's base offense level of 8 because Osorto had been convicted of a felony with a sentence of at least five years before he was deported. And because of his conviction after he was ordered deported (which occurred after he illegally reentered the United States), the PSR recommended an additional four-level increase, pursuant to U.S.S.G. § 2L1.2(b)(3)(D). After crediting Osorto for his acceptance of responsibility, the PSR determined his total offense level to be 19. Based on the same two prior convictions, the PSR also determined that Osorto had a criminal-history category of III. As a net effect of these recommendations, the PSR calculated a Guidelines sentencing range of 37 to 46 months' imprisonment.

Osorto filed a sentencing memorandum objecting. He asserted that the Guidelines placed unreasonable weight on his prior convictions. To address this problem, Osorto argued, the district court should vary downward by 7 levels to account for what Osorto described as the double-counting of his prior convictions under both the offense-level and criminal-history calculations of the Guidelines. Osorto also preserved an equal-protection challenge to the Guidelines, on the ground that they treat noncitizens differently (and more harshly) than other offenders. Nevertheless, Osorto conceded that *Adeleke*, 968 F.2d 1159, foreclosed his equal-

protection challenge. Ultimately, Osorto requested a sentence at the upper end of a proposed sentencing range of 15 to 21 months' imprisonment.

At Osorto's sentencing hearing, the district court adopted the PSR's factual statements and Guidelines calculations, and Osorto did not object. As a result, the district court determined Osorto's total offense level to be 19 and his criminal-history category to be III, corresponding to a Guidelines range of 37 to 46 months' imprisonment. Consistent with his memorandum, Osorto argued for a downward variance, while the government sought a Guidelines sentence.

The court imposed a low-end Guidelines sentence of 37 months' imprisonment and three years' supervised release. In response, Osorto renewed his objections that the sentence was substantively unreasonable and violated Osorto's right to equal protection. The court overruled Osorto's objections, and Osorto filed a timely notice of appeal.

## II. The Equal-Protection Challenges

### A. Subsections 2L1.2(b)(2) and (3)

Osorto asserts equal-protection challenges to U.S.S.G. § 2L1.2(b)'s enhancements, for prior convictions, to the base offense level for illegal reentry. As relevant here, § 2L1.2(b) imposes separate enhancements for convictions a defendant incurred both before he was ordered deported or removed for the first time (U.S.S.G. § 2L1.2(b)(2)) and after he was ordered deported or removed for the first

time (U.S.S.G. § 2L1.2(b)(3)). Depending on the nature of the prior conviction and the length of the sentence for that conviction, subsections 2L1.2(b)(2) and (3) instruct the court to enhance the base offense level by between 2 and 10 levels. Osorto's particular pre-deportation felony conviction required a 10-level enhancement under this framework, *see* U.S.S.G. § 2L1.2(b)(2)(A), while his post-deportation felony conviction called for an additional 4-level enhancement, *see* U.S.S.G. § 2L1.2(b)(3)(D).

Though § 2L1.2(b) instructs that these enhancements for prior convictions be added to increase the offense level, the Guidelines consider the same prior convictions again and separately for purposes of the criminal-history-category determination. Osorto argues that subsections 2L1.2(b)(2) and (3) violate his right to equal protection because non-U.S. citizens convicted of illegal reentry after order of deportation or removal have their prior convictions counted against them twice (once in calculating the offense level and once in determining the criminal-history category), but U.S. citizens, who cannot be convicted of committing illegal reentry after deportation, generally have their prior convictions held against them only once[1]—in the criminal-history determination.

---

[1] Osorto acknowledges that "[a] few other guidelines in Chapter Two [of the Sentencing Guidelines Manual] enhance the offense level for prior convictions." Osorto's Initial Br. at 10 n.4 (citing U.S.S.G. § 2K2.1 (the guideline applicable to felons in possession of firearms)). But he distinguishes these guidelines from subsections 2L1.2(b)(2) and (3) for two reasons. First, he notes that the only thing that makes a convicted felon's possession of a firearm illegal is his prior

**B. The framework for evaluating equal-protection challenges to federal rules that are not enacted by Congress or the President requires us to conduct both a due-process inquiry and an equal-protection analysis.**

We review de novo Osorto's constitutional challenges to subsections 2L1.2(b)(2) and (3) of the Sentencing Guidelines. *See United States v. Pressley*, 345 F.3d 1205, 1209 (11th Cir. 2003).

By its terms, the Fourteenth Amendment promises equal protection of state law. U.S. Const. amend. XIV, § 1. But when it comes to equal protection of federal law, the Fifth Amendment does that job. *Hampton v. Wong*, 426 U.S. 88, 100 (1976). Unlike the Fourteenth Amendment, the Fifth Amendment contains no express equal-protection clause. But the Fifth Amendment's guarantee of due process embodies within it the concept of equal justice under the law. *Id.*

We employ the same type of equal-protection analysis under both the Fifth and the Fourteenth Amendments. *Id.* Yet the extent of the protections under each Amendment is not always the same. *Id.*

One area where the scope of protections can differ between the Fifth and Fourteenth Amendments is law that distinguishes between citizens and noncitizens.

---

criminal history, *id.*, whereas illegal reentry after deportation is unlawful whether the noncitizen has previously been convicted of another criminal offense or not. Second, he argues that the enhancements under § 2L1.2(b) for prior convictions are steeper (and therefore harsher) than the enhancements for prior convictions under other guidelines. *Id.* For purposes of our analysis, we assume without deciding that subsections 2L1.2(b)(2) and (3) discriminate against some noncitizens in ways that other guidelines do not discriminate against citizens (and other noncitizens).

9

*See id.* at 100–01. That is so because the federal government enjoys the exclusive authority to control immigration and to regulate the relationship between the United States and noncitizen visitors. *See id.* at 101 n.21; *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). And because questions relating to these areas "are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary[,] . . . [t]he reasons that preclude judicial review of political questions[] also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Mathews*, 426 U.S. at 81–82. So while state laws that discriminate against noncitizens are subject to strict scrutiny under the Fourteenth Amendment, *see Graham v. Richardson*, 403 U.S. 365, 376 (1971), federal laws that discriminate against noncitizens must pass only rational-basis scrutiny under the Fifth Amendment, *see Mathews*, 426 U.S. at 83–85.

This dichotomy assumes, however, that the President or Congress enacts the federal provision challenged. *Hampton*, 426 U.S. at 103, 105. Where, as is the case here, a federal agency promulgates the rule in question, the rule must also survive a procedural-due-process inquiry when it effects a deprivation of life, liberty, or property. *See id.* at 102–03. Unlike the President and Congress, a federal agency may not promulgate a rule regulating noncitizens without what can be deemed as legitimate authorization to serve a specific "overriding national interest." *See id.* at 103. And "due process requires that there be a legitimate basis for presuming that

10

the [agency's] rule was actually intended to serve that [overriding national] interest." *Id.*

The government can satisfy this due-process inquiry in one of two ways. *See id.* First, Congress or the President can "expressly mandate[]" the rule, in which case we would generally conclude that the agency adopted the rule because of "any interest which might rationally be served" by it. *Id.* Second, when neither Congress nor the President explicitly directs the rule, the agency's rationale for it must identify "interests on which that agency may properly rely in making a decision implicating the constitutional and social values at stake." *Id.* at 113–14.

If the agency-promulgated rule cannot survive this inquiry, we need not conduct a substantive equal-protection review because the rule must be held unconstitutional, regardless. *Id.* at 103. But if the rule passes procedural-due-process muster, we then engage in rational-basis review to determine whether the rule satisfies equal protection. *See id.*; *Mathews*, 426 U.S. at 83–85. Rational-basis review considers whether the classification at issue is "rationally related to a legitimate governmental purpose." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).

As we have explained, Osorto argues that the Sentencing Guidelines, which are issued by the U.S. Sentencing Commission, a federal agency, unlawfully recommend longer prison sentences for noncitizens convicted of illegal reentry after

other criminal convictions. A longer prison sentence obviously constitutes a deprivation of liberty. So under the Fifth Amendment, it "must be accompanied by due process." *Hampton*, 426 U.S. at 103. As a result, the Constitution mandates "some judicial scrutiny of the deprivation." *Id.*

### C. Subsections 2L1.2(b)(2) and (3) do not violate procedural due process.

Osorto's case is not the first one where we've considered whether enhancements for pre-deportation convictions (for which § 2L1.2(b)(2) provides) transgress equal-protection rights. We addressed this same issue almost thirty years ago in *Adeleke*, 968 F.2d 1159. When we did, though, we did not apply the *Hampton* analysis.

Nevertheless, we concluded that enhancements for pre-deportation convictions do not violate equal protection. *Id.* at 1160–61. And even though the guideline we analyzed in *Adeleke* was an older version of today's § 2L1.2(b)(2), the two iterations are similar enough that, as Osorto concedes, under our prior-precedent rule, we remain bound by that ruling to reach the same conclusion in Osorto's case. *See United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc). Other courts have also rejected equal-protection challenges to the previous version of § 2L1.2(b)(2). *See United States v. Ruiz-Chairez*, 493 F.3d 1089, 1092 (9th Cir. 2007); *see also United States v. Cardenas-Alvarez*, 987 F.2d 1129, 1134 (5th Cir. 1993) (plain-error review).

12

But even if we were not bound by *Adeleke*, we would arrive at the same conclusion, anyway, because under *Hampton*, due process and equal-protection law require it. And since the same analysis that requires us to uphold § 2L1.2(b)(2) as constitutional dictates that we also sustain § 2L1.2(b)(3), we analyze the challenged provisions together.

As *Hampton* governs our analysis here, we review it in some detail. In *Hampton*, lawfully admitted resident noncitizens challenged the Civil Service Commission's ("CSC") regulation precluding noncitizens from employment in the federal competitive civil service. *See* 426 U.S. at 90 & n.1. The Supreme Court held that the regulation violated procedural due process. *See id.* at 103–17. It reached this determination after analyzing the rule in six steps.

First, the Court assumed that had Congress or the President expressly imposed the same citizenship requirement, that requirement "would be justified by the national interest in providing an incentive for aliens to become naturalized, or possibly even as providing the President with an expendable token for treaty negotiating." *Id.* at 105. Put simply, it would pass rational-basis equal-protection review.

Second, the Court examined whether Congress or the President had "required the [CSC] to adopt" the challenged rule. *See id.* at 105, 110. As the Court explained, were that the case, the Court would consider the wide set of justifications supplying

13

a rational basis for the rule. *See id.* at 105. But the Court found it "perfectly clear" that neither Congress nor the President had directed the CSC to adopt the rule. *Id.* Nor did the Court see any basis for concluding that Congress or the President ratified the rule after the CSC promulgated it. *See id.* at 106–13.

Third, although neither Congress nor the President "expressly imposed" the challenged CSC rule, the Court noted that it had existed for nearly a century and that both branches had acquiesced in it. *Id.* at 105. To evaluate the significance of that acquiescence, the Court considered "the extent to which the policy ha[d] been given consideration by Congress or the President, and the nature of the authority specifically delegated to the [CSC]." *Id.*

The Court acknowledged that the President had previously issued an executive order that "authorized [the CSC] to establish standards with respect to citizenship, age, education, training and experience, suitability, and physical and mental fitness, and for residence or other requirements which applicants must meet to be admitted to or rated in examinations." *Id.* at 111. Nevertheless, the Court concluded that "[t]his direction 'to establish standard[s], with respect to citizenship' is not necessarily a command to require citizenship as a general condition of eligibility for federal employment." *Id.* at 112.

The Court further observed that this Executive Order delegated to the CSC the President's authority, established by Congress, to authorize regulations "as will

14

best promote the efficiency of [the] Service." *See id.* at 113 (quoting 5 U.S.C. § 3301(1)). Together, the Court concluded, the statute and Executive Order allowed the CSC to "retain or modify the citizenship requirement without further authorization from Congress or the President." *Id.* In other words, the CSC had general authority to issue rules related to citizenship as relevant to the agency's business. *See id.* But that statute, like other laws the Court reviewed, did not reflect that Congress had approved or disapproved of the policy embodied in the challenged regulation. *See id.* at 106–10, 113.

So fourth, the Court examined "whether the national interests which the Government identifie[d] as justifications for the [CSC] rule are interests on which that agency may properly rely in making a decision implicating the constitutional and social values at stake." *Id.* at 113–14. In so doing, the Court noted that the CSC's duties include the creation and enforcement of regulations that enhance the smooth operation of the federal civil service. *Id.* at 114. In contrast, the CSC has "no responsibility for foreign affairs, for treaty negotiations, for establishing immigration quotas or conditions of entry, or for naturalization policies." *Id.* Nor is it "within the responsibility of the [CSC] to be concerned with the economic consequences of permitting or prohibiting the participation by aliens in employment opportunities in different parts of the national market." *Id.* But, the Court

15

acknowledged, establishing regulations to "best promote the efficiency of the federal civil service" does fall within the CSC's bailiwick. *Id.*

Fifth, the Court explored whether the one valid CSC interest the government identified as supporting the rule—the administrative convenience of excluding all noncitizens from the civil service to avoid having noncitizens in sensitive positions where allegiance to the United States was appropriate—actually motivated the agency to promulgate the challenged rule. *Id.* at 115. The Court concluded that it did not. *See id.*

As the Court observed, the CSC was supposed to serve as an expert in federal civil-service matters. *See id.* For that reason, it was expected to demonstrate expertise in handling its duties and to explain the reasons for its decisions. *Id.* Yet nothing suggested that the CSC in fact engaged in "any considered evaluation of the relative desirability of a simple exclusionary rule on the one hand, or the value to the service of enlarging the pool of eligible employees on the other." *Id.* And the Court also could not presume that classifying positions whose duties necessarily demanded citizenship would be difficult or burdensome for the CSC. *Id.* Had the CSC attempted to classify federal civil-service positions, the Court reasoned, that action would have shown that the CSC "had at least considered the extent to which the imposition of the rule is consistent with its assigned mission." *Id.* at 116 n.48. But since it did not and no evidence supported the CSC's stated administrative interest

16

in the challenged rule, the Court deemed that interest "nothing more than [the CSC's] hypothetical justification" for the rule. *Id.* at 115–16.

Sixth, the Court then weighed that "hypothetical justification" for the rule against "the public interest in avoiding the wholesale deprivation of employment opportunities caused by the [CSC's] indiscriminate policy." *Id.* Not surprisingly, the Court concluded that the administrative rationale the government proffered in litigation did not sufficiently justify the deprivation of liberty to satisfy due process. *Id.* at 116–17.

With this framework in mind, we examine subsections 2L1.2(b)(2) and (3).

### 1. If Congress expressly imposed the increased penalties reflected in subsections 2L1.2(b)(2) and (3), those penalties would be a valid exercise of its authority to control immigration.

As in *Hampton*, we begin our procedural-due-process examination by considering whether any justification would support the challenged rules, had they been expressly imposed by one of the political branches. For example, could Congress pass legislation mandating longer sentences for noncitizens convicted of illegal reentry after they incurred other criminal convictions?

The answer is yes: Congress has plenary authority to control immigration, including by defining criminal immigration offenses. *United States v. Henry*, 111 F.3d 111, 113–14 (11th Cir. 1997) (citing *Pena-Cabanillas v. United States*, 394 F.2d 785, 788 (9th Cir. 1968)). For that reason, 8 U.S.C. § 1326, the criminal statute

to which § 2L1.2 pertains, represents a valid exercise of this regulatory authority. *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998). And just as Congress could, by statute, define this offense, it could further specify increased penalties for certain offenders, as the Sentencing Commission has recommended under U.S.S.G. subsections 2L1.2(b)(2) and (3).

To that end, Congress enacted and later amended § 1326(b) to increase the maximum illegal-reentry sentences for noncitizens whose previous removal occurred after they were convicted of a felony. *See* Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7345(a)(2), 102 Stat. 4181, 4471 (1988); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001(b)(1)(B) and (b)(2), 108 Stat. 1796, 2023 (1994). As we have noted, the Supreme Court has recognized that the increased maximum sentences under § 1326(b) express a congressional policy to address recidivism. *See Almendarez-Torres*, 523 U.S. at 230.

Congress may have reasonably concluded that the prospect of such increased sentences would deter noncitizens who previously sustained criminal convictions from reentering unlawfully. In these ways, Congress's enactment and amendment of § 1326(b) evidence its determination of "overriding national interests," *Hampton*, 426 U.S. at 101, in deterring noncitizens from illegally reentering the United States

18

after a criminal conviction, *see Alvarenga-Villalobos v. Ashcroft*, 271 F.3d 1169, 1174 (9th Cir. 2001).

### 2. Neither Congress nor the President mandated the Commission to promulgate § 2L1.2(b)(2) or (3).

But despite Congress's enactment and amendment of § 1326(b), and as in *Hampton*, neither Congress nor the President required the rules under review here— U.S.S.G. subsections 2L1.2(b)(2) and (3). To be sure, subsection 2L1.2(b)(2) echoes § 1326(b)'s increases in maximum penalties for noncitizens who illegally reenter the United States after removal following conviction of another crime. But contrary to the Dissent's suggestion, *see* Dissent at 42–44, Congress never expressly mandated the Sentencing Commission to promulgate either subsection 2L1.2(b)(2) or (3).

A rule that is "expressly mandated by the Congress or the President" is easily identifiable: an agency issues it in response to a statute or executive order that, by its language, "expressly" directs the agency to promulgate a rule or rules on a given matter. And as *Hampton* explains, once an agency promulgates such a required rule, the agency is not free to scrap the rule in the absence of congressional or executive direction. *See Hampton*, 426 U.S. at 112 (that Congress or the President did not adopt the citizenship rule in *Hampton* "is demonstrated by the elimination of the citizenship requirement for employment in the Postal Service which took place after this litigation commenced").

19

By its own language, § 1326(b) does not direct any agency to issue any rules of any type. Nor, as relevant to criminal sentencing, does it impose mandatory minimum sentences for illegal reentry after deportation when the defendant was convicted of a qualifying crime before he was deported the first time. Rather, it simply allows higher maximum penalties for defendants previously removed after sustaining certain criminal convictions. *See* 8 U.S.C. § 1326(b). In this way, § 1326(b) is broader than both subsections 2L1.2(b)(2) and (3), which refer to the defendant's *first* removal and convictions sustained before and after it, respectively. *See* U.S.S.G. § 2L1.2(b)(2)–(3).

And although the Sentencing Commission submits its amended Guidelines to Congress, 28 U.S.C. § 994(p), Congress did not enact legislation affirmatively approving—or disapproving—the 2016 versions of subsections 2L1.2(b)(2) and (3).[2] At best, we can say that Congress acquiesced in them when it allowed them to take effect. *See Hampton*, 426 U.S. at 107–08 ("When the [CSC] was created, it immediately adopted the citizenship requirement, and that fact was duly reported to Congress."). Finally, in the ultimate test, nothing precludes the Sentencing Commission from eliminating the enhancements in § 2L1.2(b)(2). As *Hampton*

---

[2] Under 28 U.S.C. § 994(p), new and revised guidelines become effective if Congress does not legislate to the contrary within 180 days of the Sentencing Commission's submission of them to Congress. *See* U.S. Sent'g Comm'n R. Prac. & Proc. 4.1.

shows, the Commission's flexibility in this regard is inconsistent with the notion of an express congressional mandate under § 1326(b).[3] *See id.* at 112.

Although § 1326(b) does not "expressly mandate" the Sentencing Commission to issue any rules (guidelines), that does not end our analysis under *Hampton*. Rather, we must consider *Hampton*'s alternative method for presuming a rule was issued for the reason the agency asserts: whether the agency's rationale for the rule identifies "interests on which that agency may properly rely in making a decision implicating the constitutional and social values at stake." *See id.* at 114. We therefore continue under the *Hampton* framework.

### 3. Congress's enactment and amendment of § 1326(b) shows that Congress has approved of the national interest that subsections 2L1.2(b)(2) and (3) promote.

Next, we consider whether Congress or the President has given any indication concerning its view of policies that the challenged rules support. We conclude that Congress has.

As we have noted, § 1326(b) represents Congress's approval of a national policy to deter noncitizens from illegally reentering the United States after a criminal

---

[3] We respectfully disagree with the Dissent's suggestion that *Adeleke* "implicitly found that Guideline § 2L1.2(b)(2) . . . implemented a 'policy decision made by Congress and the President.'" Dissent at 43 (quoting *Hampton*, 426 U.S. at 105). *Adeleke* did not mention *Hampton*. And as we have explained, the text of § 1326(b) establishes that it did not "expressly mandate[]" that the Sentencing Commission (or any other agency) promulgate any rule. Rather, *Adeleke* suggested that § 1326(b) evidences a congressional policy judgment that noncitizens with other convictions should be "strongly deterred from re-entering the United States." *See Adeleke*, 968 F.2d at 1160.

conviction. We think that's pretty clear evidence that Congress has considered and agrees with the principles subsections 2L1.2(b)(2) and (3) promote. In recommending longer prison terms for certain noncitizens convicted of illegal reentry, subsections 2L1.2(b)(2) and (3) can reasonably be viewed as deterring those with prior convictions from unlawfully reentering.

Subsection 2L1.2(b)(2) recommends a higher Guidelines offense level (and therefore a potentially higher penalty) for anyone who illegally reenters the United States after a first deportation that followed a qualifying conviction. In line with the deterrent effect of § 1326(b)'s higher maximum penalties for those who illegally reenter the United States after deportation following a qualifying conviction, a higher recommended Guidelines sentence may reasonably be viewed as a deterrent for some from unlawfully reentering the United States after being deported following a qualifying conviction.

Subsection 2L1.2(b)(3) also furthers the interest of deterrence. That subsection recommends a higher sentence for a person who illegally reenters the United States and has incurred a qualifying other conviction after he was deported for the *first* time but before his current illegal-reentry offense. According to the Sentencing Commission's 2015 study on illegal-reentry offenses, the 1,894 such offenders in fiscal year 2013 whose exact number of prior deportations was known averaged 3.2 deportations *before* the one for which he was being prosecuted in

2013.[4] U.S. Sent'g Comm'n, *Illegal Reentry Offenses* 14 (April 2015). Of that same group of 1,894, 92% had at least one prior non-traffic conviction, and those that did averaged 4.4 prior convictions. *Id.* at 16. These numbers establish that many of those whom the United States chooses to prosecute for illegal reentry after deportation both repeatedly unlawfully reenter the United States and have several prior convictions. These facts are important to understanding how § 2L1.2(b)(3) operates to deter additional illegal reentries.

As we have noted, § 2L1.2(b)(3) recommends an enhancement for a single prior conviction incurred after a defendant's *first* deportation. So to the extent that a defendant is convicted of a qualifying offense after his first deportation but before his second, for example, prior to reentering for a third time, § 2L1.2(b)(3) recommends a higher sentence not only for the second illegal reentry but also for any illegal reentries after that one. And while the higher sentence for the second unlawful reentry cannot deter unlawful reentry that has already occurred, it can deter future illegal reentries: a noncitizen who considers the law before illegally reentering for a third or later time will know that his conviction incurred after his

---

[4] The Commission was careful to note—and we likewise emphasize—that its conclusions applied to only those noncitizens sentenced under § 2L1.2 in 2013 and were not representative of all noncitizens not lawfully present in the United States. *See Illegal Reentry Offenses* at 2 (noting that "the information [in the report] should not be interpreted as representative of the characteristics of illegal immigrants generally").

23

first deportation but before his second will cause him to receive an enhancement under § 2L1.2(b)(3).

The Dissent asserts that we have "read Congressional expressions of policy preferences too broadly." Dissent at 46. We respectfully disagree. Rather, we construe the congressional policy judgment behind § 1326(b)—deterrence of those who have been deported and who have other convictions, from illegally reentering the United States again—exactly as we suggested in our binding precedent nearly 30 years ago. *See Adeleke*, 968 F.2d at 1160–61. For these reasons, the Sentencing Commission's issuance of subsections 2L1.2(b)(2) and (3) is unlike the situation in *Hampton*, where the Court could discern no clear policy or statement of national interest that Congress or the President had made that might support the CSC rule at issue. *See Hampton*, 426 U.S. at 109–10.

### 4. When it promulgated subsections 2L1.2(b)(2) and (3), the Sentencing Commission properly relied on interests within its purview.

We turn fourth to whether the Sentencing Commission's stated rationales for promulgating subsections 2L1.2(b)(2) and (3) qualify as valid considerations for the agency. We conclude that they do.

With respect to both subsections 2L1.2(b)(2) and (3), the Commission reasoned that "the new specific offense characteristics more appropriately provide for incremental punishment to reflect the varying levels of culpability and risk of recidivism reflected in illegal reentry defendants' prior convictions." U.S.S.G. am.

24

802, Reason for Amendment. As to § 2L1.2(b)(3) in particular, the Commission further expounded on this rationale, opining "that a defendant who sustains criminal convictions occurring before and after the defendant's first order of deportation warrants separate sentencing enhancement." *Id.*

These concerns—that sentences reflect culpability and risk of recidivism—fall properly within the province of the Sentencing Commission. Congress created the Commission to "establish sentencing policies and practices for the Federal criminal justice system," which includes immigration crimes. 28 U.S.C. § 991(b)(1). In fulfilling its mission, the Commission must, among other things, ensure that sentencing policies and practices "reflect the seriousness of the offense, . . . provide just punishment for the offense[,] . . . afford adequate deterrence to criminal conduct[,] . . . [and] protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2); *see* 28 U.S.C. § 991(b)(1)(A). These are just different ways to say "culpability" and "risk of recidivism." And the Commission was required to consider "the kinds of sentences available," 18 U.S.C. § 3553(a)(3), including Congress's judgment to increase maximum sentences under § 1326(b).

To accomplish these tasks, the Commission formulates guidelines "regarding the appropriate form and severity of punishment for offenders convicted of federal crimes; . . . advise[s] and assist[s] Congress, the federal judiciary, and the executive branch in the development of effective and efficient crime policy; and . . . collect[s],

25

analyze[s], research[es], and distribute[s] a broad array of information on federal crime and sentencing issues." *Illegal Reentry Offenses*, *supra*, at 1 n.1 (citing 28 U.S.C. § 995(a)(14), (15), and (20)). So the promulgation of guidelines that reasonably could be expected to have the effect of deterring illegal reentries of those who have committed other crimes is entirely consistent with the Sentencing Commission's duties and responsibilities.

Plus, the rationales of culpability and risk of recidivism logically support Congress's adopted national interest in deterring noncitizens with criminal convictions from repeatedly illegally reentering. A noncitizen with criminal convictions who knows that more severe punishment may follow repeated unlawful reentries and the commission of additional crimes while unlawfully here is more likely to be deterred from illegally reentering than a noncitizen with criminal convictions who would not face increased penalties.

Unlike the CSC in *Hampton*, then, the Sentencing Commission could properly rely on its stated interests—that punishments reflect culpability and risk of recidivism—when it issued the challenged rules here. In other words, the rationale underpinning subsections 2L1.2(b)(2) and (3) is not "far removed from [the Sentencing Commission's] normal responsibilities" but rather, falls squarely within them. *See Hampton*, 426 U.S. at 105.

### 5. *The Sentencing Commission appropriately relied on its expertise and a study it undertook on sentencing for illegal-reentry offenses when it promulgated subsections 2L1.2(b)(2) and (3).*

Acting under its authority to study and distribute information on federal crime and sentencing issues, *see* 28 U.S.C. § 995(a)(14), (15), the Sentencing Commission conducted its 2015 study to analyze sentencings for illegal-reentry offenses. *See generally Illegal Reentry Offenses*, *supra*. Among other things, the Commission observed that roughly one in four cases resolved under the Sentencing Guidelines involves a crime of illegally reentering the United States. *Id.* at 1.

Then the Commission analyzed the data from the sentencings of all 18,498 non-citizens with illegal-reentry convictions who were sentenced under § 2L1.2 in fiscal year 2013. *See id.* at 1–2. At the time of the study and until the Commission promulgated § 2L1.2(b)(3), § 2L1.2(b) provided for an offense enhancement of up to sixteen levels, based solely on prior convictions conferred *before* the defendant was previously deported or unlawfully remained in the United States. *See* U.S.S.G. § 2L1.2(b) (2015). In contrast, the guideline contained no enhancement for prior convictions endured *after* the defendant was previously deported or ordered removed. *See id.*

To show the impact of the then-existing § 2L1.2(b) enhancement for prior convictions, the Commission's report used the example of a defendant with a criminal-history category of III, meaning that the defendant necessarily had prior

27

convictions of some type. *See Illegal Reentry Offenses* at 6–7. As the Commission noted, such a defendant whose conviction occurred *before* his initial deportation and whose conviction qualified for the 16-level enhancement would have a Guidelines range of 46 to 57 months' imprisonment (assuming a deduction for acceptance of responsibility). *Id.* But the Guidelines range for a defendant whose otherwise-identical criminal history occurred *after* his initial deportation would be 2 to 8 months' imprisonment. *See id.* As a result, the Commission pointed out, the defendant with the pre-deportation conviction would face a Guidelines range 23 times higher than the defendant with no pre-deportation convictions. *Id.*

Although 8 U.S.C. § 1326(b) and U.S.S.G. § 2L1.2(b) did not at that time "provide for enhancements based on convictions for offenses committed *after* an offender illegally reentered the country," the report noted that "48.0 percent of all offenders in the sample were convicted of at least one post-reentry offense [other than illegal entry or reentry]." *Id*. at 18. The Sentencing Commission also remarked that under the then-existing § 2L1.2(b), defendants who did not receive an enhancement for prior convictions nonetheless had, on average, "2.0 prior convictions and 1.8 prior sentencing events." *Id.* at 20. Yet the then-existing enhancement often did not apply because "the convictions occurred *after* the most recent illegal reentry." *See id.* Ultimately, the Sentencing Commission described the high rate of defendants with prior convictions who did not receive an

28

enhancement under then-existing § 2L1.2(b) as a "key finding," emphasizing that "[a] significant proportion of illegal reentry offenders committed serious offenses—including drug-trafficking and violent offenses—between the time that they were first deported and their arrest for the instant illegal reentry offense." *Id.* at 27–28.

In the aftermath of the Sentencing Commission's report on illegal-reentry offenses, in 2016, the Commission revised its prior-conviction enhancements for those convicted of illegal reentry. Whereas the pre-2016 § 2L1.2(b) guideline imposed up to a sixteen-level enhancement for a single prior conviction incurred before the defendant's previous deportation, the revised version of the guideline, as we have noted, lowered the maximum enhancement for a pre-deportation conviction to ten levels. But through § 2L1.2(b)(3), the revised version also announced for the first time up to a ten-level enhancement for prior convictions sustained *after* the defendant's first deportation.

In the explanation accompanying Amendment 802 to the Sentencing Guidelines, which made these changes, the Commission identified its reasons for the modifications to § 2L1.2(b). The Commission first noted that the amendment resulted from "the Commission's multi-year study of immigration offenses and related guidelines, and reflect[ed] extensive data collection and analysis relating to immigration offenses and offenders." U.S.S.G. am. 802, Reason for Amendment. Indeed, the Commission explained, "[b]ased on this data, legal analysis, and public

29

comment, the Commission identified a number of specific areas where changes were appropriate." *Id.*

Among these were the changes to § 2L1.2(b)(2) and the addition of § 2L1.2(b)(3). As the explanation remarked, Amendment 802 addressed concerns about, among other things, the perceived inequality between recommended sentences for those convicted of prior offenses before deportation and those convicted after. *See id.* ("The amendment addresses these concerns by accounting for prior criminal conduct in a broader and more proportionate manner.").

The Dissent attempts to minimize the Commission's study as "just a data collection project that recites various statistical findings and explains the Commission's methodologies." Dissent at 48. Although we respectfully disagree with that characterization,[5] even if it were accurate, the Commission noted that it used this statistical analysis, along with "legal analysis" and "public comment" to arrive at the 2016 amendments to § 2L1.2(b). That is a textbook example of employing agency expertise to promulgate rules and regulations.

Of course, the Sentencing Commission's reliance on its expertise to carefully study what it perceived to be a problem in the sentencing of illegal-reentry offenders and to use the results of its analysis to promulgate the current versions of

---

[5] As we have noted, the study identified certain inequities in pre-2016 § 2L1.2(b). It also made "key findings" based on its statistical analysis.

subsections 2L1.2(b)(2) and (3) stands in marked contrast to what the CSC did in *Hampton.* There, as the Supreme Court noted, the CSC failed to apply any of its expertise and to undertake any kind of analysis of the need to limit noncitizens' employment in federal jobs. *See Hampton*, 426 U.S. at 115–16 & n.48. So once again, this case differs in an important way from the factual situation at issue in *Hampton*.

> **6. The Sentencing Commission's stated rationales that sentencing reflect culpability and risk of recidivism, as narrowly addressed to only those noncitizens who have previously been deported and who have prior convictions, sufficiently justify the deprivation of liberty that subsections 2L1.2(b)(2) and (3) recommend.**

Last, we must consider whether the Sentencing Commission's stated rationales for subsections 2L1.2(b)(2) and (3) sufficiently justify the deprivation of liberty that they recommend. We conclude that they do.

Both Osorto and the Dissent contend that subsections 2L1.2(b)(2) and (3) discriminate against noncitizens because these guidelines, by definition of the crimes they cover, apply to only noncitizens and because they double-count prior convictions, while other guidelines that apply to citizens count prior convictions only once—in the criminal-history calculation. *See* Dissent at 40-41.

We respectfully disagree with Osorto and the Dissent's characterization of the guidelines. Subsections 2L1.2(b)(2) and (3) pertain to only those noncitizens who are unlawfully in the United States and have committed another crime while illegally

31

here. As for the other guidelines that only single-count prior convictions, they apply equally to all citizens and all noncitizens (including those noncitizens who are unlawfully in the United States). So the group of individuals arguably discriminated against by subsections 2L1.2(b)(2) and (3)'s double-counting is not all noncitizens; it is the smaller subset of noncitizens who are unlawfully present in the United States and have also committed at least one other qualifying violation. *Cf. Cardenas-Alvarez*, 987 F.2d at 1134 (noting that "the guidelines were devised to and do treat all persons with aggravated felonies who commit this crime equally").

But significantly, these individuals are being prosecuted under § 1326(b) for the very reason that they are unlawfully in the United States. That is their crime as defined by Congress.

And that fact is important to our due-process analysis because we have observed that § 1326(b)'s increased maximum sentences for defendants with prior convictions indicates "a Congressional [judgment] that . . . the prior conviction is a critical part of what makes the current reentry wrongful." *Alfaro-Zayas*, 196 F.3d at 1341 n.5 (citation and quotation marks omitted). That is to say, Congress determined that illegally being present in the country after already having been convicted of otherwise violating the law here makes the crime of illegally being in the United States a different and worse crime than it would be in the absence of the prior conviction. For that reason, considering the prior convictions in the criminal-history

32

calculation does not capture what we have described as the nature of the crime at issue here.

And since Congress was concerned that other offenses a noncitizen commits while unlawfully here are what make this crime more consequential than illegal reentry by itself, it does not matter to the gravity of the crime whether the noncitizen was convicted of other offenses before (§ 2L1.2(b)(2)) or after (§ 2L1.2(b)(3)) he was deported the first time—as long as he was convicted of them. Similarly, because Congress sought to deter noncitizens with prior convictions from repeatedly reentering the United States, again, it makes no difference if the noncitizen was convicted of another crime before (§ 2L1.2(b)(2)) or after (§ 2L1.2(b)(3)) he was deported the first time;  as we have explained, the national interest of deterrence embodied in § 1326(b) is consistent with deterring both kinds of conduct.

Subsections 2L1.2(b)(2) and (3) are therefore narrowly targeted to address the same national interest that Congress embraced when it enacted § 1326(b).  The guidelines in question do not affect noncitizens who are lawfully present in the United States, and they don't apply to noncitizens who are illegally here if they have not committed other crimes while in the country.

Rather, they are directed solely at those noncitizens who have previously been deported after a prior conviction here and seek to reenter, and those who have previously been deported and have committed other crime here after their first

deportation.  Subsections 2L1.2(b)(2) and (3) also are designed to more evenly and accurately reflect culpability and risk of recidivism:  rather than, as happened under the prior version of § 2L1.2(b)(2), recommending grossly disparate sentences for two noncitizens who unlawfully reenter after deportation and who have committed the same other crime—one before his first deportation and one after—the current version of the guidelines would recommend the same sentence for both defendants. Put another way, subsections 2L1.2(b)(2) and (3) now apply a more equal and less lopsided approach to culpability, risk of recidivism, and deterrence.

For all these reasons, the Sentencing Commission's promulgation of subsections 2L1.2(b)(2) and (3) is appreciably different from the CSC's issuance of the rule at issue in *Hampton*.  So under the *Hampton* framework, we must conclude that subsections 2L1.2(b)(2) and (3) satisfy procedural due process.

### D. The guidelines at subsections 2L1.2(b)(2) and (3) do not violate equal protection.

Because subsections 2L1.2(b)(2) and (3) do not offend procedural due process, we turn next to the equal-protection analysis.  That requires us to consider whether subsections 2L1.2(b)(2) and (3) bear a rational relationship to the interests the Commission relied on—ensuring sentences reflect culpability and risk of recidivism.  We conclude that they do.

Consistent with Congress's judgment as reflected in § 1326(b), the Commission could have reasonably determined that the sentence of a noncitizen who

34

illegally enters this country more than once and commits crimes when here illegally—whether he does so before or after he has been ordered deported or removed for the first time—should reflect that he is more blameworthy than a noncitizen who simply illegally enters the United States more than once but is otherwise law-abiding while here. It likewise rationally could have concluded that a noncitizen who illegally enters the United States more than once and also engages in other criminal activity while here poses a greater risk of unlawfully returning to the United States in the future. Because Fifth Amendment equal-protection analysis demands nothing more, we must conclude that the post-deportation conviction enhancement does not violate equal protection.

### E. Section 2L1.2 does not violate Congress's directive that sentences be neutral as to national origin.

Osorto separately argues that by treating noncitizens differently from citizens, § 2L1.2 also violates Congress's directive that sentencing be neutral as to national origin. *See* 28 U.S.C. § 994(d). We respectfully disagree.

As we have explained, § 994(d) means that national origin, among other factors, is "completely irrelevant for sentencing purposes." *United States v. Burgos*, 276 F.3d 1284, 1291 (11th Cir. 2001) (citations and internal quotation marks omitted). Although we have not addressed this question previously, we join other circuits in recognizing that alienage—not being a citizen of the United States— differs from national origin, i.e. the particular country in which one was born. *See*

35

*United States v. Restrepo*, 999 F.2d 640, 644 (2d Cir. 1993); *United States v. Nnanna*, 7 F.3d 420, 422 (5th Cir. 1993) (per curiam); *United States v. Smith*, 27 F.3d 649, 654 (D.C. Cir. 1994); *United States v. DeBeir*, 186 F.3d 561, 569 (4th Cir. 1999). For that reason, § 2L1.2 did not unlawfully require the district court to consider national origin in imposing Osorto's sentence.

## III.  Substantive Reasonableness

Finally, Osorto argues that his sentence of 37 months' imprisonment is substantively unreasonable. We review for abuse of discretion the substantive reasonableness of a sentence. *United States v. Plate*, 839 F.3d 950, 956 (11th Cir. 2016). Because Osorto challenges the sentence, he must shoulder the burden of demonstrating that the sentence is unreasonable, considering the complete record, the § 3553(a) factors, and the substantial deference we give sentencing courts. *United States v. Gomez*, 955 F.3d 1250, 1255 (11th Cir. 2020) (per curiam). He cannot make that showing here.

Osorto bases his argument that his sentence is substantively unreasonable on his contention that the district court "gave significant weight to an impermissible consideration"—namely, the subsection 2L1.2(b)(2) and (3) enhancements for his prior convictions. Osorto asserts that the district court could not permissibly rely on

36

these enhancements because they violate equal protection. We have already explained why that is not so.[6]

To the extent that Osorto's argument can be construed as alleging impermissible double-counting under the Sentencing Guidelines, that, too, fails. We conduct de novo review of a double-counting objection to the Guidelines. *United States v. Matos-Rodriguez*, 188 F.3d 1300, 1310 (11th Cir. 1999).

"Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Whyte*, 928 F.3d 1317, 1338 (11th Cir. 2019) (citation and quotation marks omitted). Nevertheless, we have explained that double-counting is allowable "if the Sentencing Commission intended the result, and . . . each section [applied] concerns conceptually separate notions relating to sentencing." *Adeleke*, 968 F.2d at 1161 (citations and internal quotation marks omitted).

In *Adeleke*, we explained that an earlier version of § 2L1.2(b)(2) and the Chapter Four criminal-history guidelines do not impermissibly double-count prior

---

[6] In his reply brief, Osorto also argues that his sentence was substantively unreasonable because the Sentencing Commission did not rely on empirical data and merely sought to implement Congress's scheme for maximum punishment. But Osorto abandoned these arguments by not raising them in his opening brief. *See United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004) (per curiam). So we do not consider them here.

convictions because the Sentencing Commission "clearly intended" this result and because different policies—deterrence and recidivism, respectively—motivated each provision. *Id.* We remain bound by that holding as to § 2L1.2(b)(2).

As for § 2L1.2(b)(3), we similarly conclude that the Sentencing Commission undoubtedly intended for a noncitizen who illegally reentered the United States after previous deportation or removal to have his post-deportation convictions accounted for both in his offense conduct and in his criminal history. We know this because the Sentencing Commission acknowledged this result. *See* U.S.S.G. § 2L1.2 cmt. n.3 ("A conviction taken into account under subsection (b)(1), (b)(2), or (b)(3) is not excluded from consideration of whether that conviction receives criminal history points pursuant to Chapter Four, Part A (Criminal History)."). Plus, we presume that the Sentencing Commission anticipated applying separate guideline sections cumulatively, unless the Guidelines expressly indicate the contrary. *Matos-Rodriguez*, 188 F.3d at 1310. Nothing in the Guidelines suggests that the Commission did not intend the alleged double-counting result.

So we must consider whether § 2L1.2(b)(3) and Chapter Four (pertaining to determination of the criminal-history category) involve conceptually separate concerns related to sentencing. The criminal-history section of the Guidelines embodies concerns related to punishing recidivists more severely. *Adeleke*, 968 F.2d at 1161. Even if § 2L1.2(b)(3)'s purpose relating to recidivism echoes that of

38

Chapter Four, § 2L1.2(b)(3)'s concern regarding culpability for the particular offense for which the defendant is being sentenced does not. Rather, as the Commission's *Illegal Reentry Offenses* report suggests and consistent with our precedent on § 1326(b), § 2L1.2(b)(3) contemplates a harm—the act of committing other crimes while illegally in the United States—that is separate from the one Chapter Four seeks to address generally. Consequently, § 2L1.2(b)(3) does not engage in unlawful double-counting.

Osorto offers no other reasons why his sentence is substantively unreasonable, and we find no basis for concluding that it is. The district court stated that it had considered all the § 3553(a) factors and the Sentencing Guidelines, and it emphasized Osorto's history and characteristics in imposing his sentence. In addition, Osorto's sentence falls at the low end of his Guidelines range. We generally anticipate that a sentence within the Guidelines range is reasonable. *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008) (per curiam). And at 37 months, it falls well below the statutory maximum term of 20 years' imprisonment. *See* 8 U.S.C. § 1326(b)(2). A sentence that comes in far below the statutory maximum penalty is another indicator of reasonableness. *Gomez*, 955 F.3d at 1260. In sum, we hold that the district court did not abuse its discretion, and Osorto's sentence is substantively reasonable.

39

## IV. Conclusion

We hold that the Sentencing Guidelines' enhancements under subsections 2L1.2(b)(2) and (3), for criminal convictions received before and after the defendant's previous deportation or removal, do not violate the Constitution's guarantee of equal protection. Nor do they cause unlawful double-counting in violation of due process or otherwise. We also conclude that the sentence imposed in this case is substantively reasonable. For these reasons, we affirm.

**AFFIRMED.**

MARTIN, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that we are bound by United States v. Adeleke, 968 F.2d 1159 (11th Cir. 1992) to reject Mr. Osorto's equal protection challenge to United States Sentencing Guideline § 2L1.2(b)(2).  I write separately about the other subsection of that Guideline at issue here (§ 2L1.2(b)(3)), however, because I do not believe it passes constitutional muster.

Mr. Osorto challenges Guideline § 2L1.2(b)(3) on equal protection grounds. This Guideline makes for tougher sentences for defendants who commit a designated offense after reentering the United States without authorization.  See USSG § 2L1.2(b)(3).  This list of designated offenses does not include the offense of unauthorized reentry itself.  See id.  Meanwhile, a defendant is already punished for both the unauthorized reentry and any other offense that leads to the increased punishment imposed by § 2L1.2(b)(3) on account of the calculation of a defendant's criminal history under the Sentencing Guidelines.  See USSG § 4A1.1(b).  The result is that any offense committed after unauthorized reentry is double-counted for noncitizens in their Guideline calculation based on little more than their immigration status.  Sentencing Guideline § 2L1.2(b)(3) therefore subjects noncitizen defendants to more severe punishment than citizens who commit the same crime.  Mr. Osorto argues that this more severe punishment

41

imposed upon him because he is a noncitizen violates his Fifth Amendment right to equal protection of the laws.  U.S. Const. Amend. V; see United States v. Windsor, 570 U.S. 744, 774, 133 S. Ct. 2675, 2695 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws").  I believe he is right.

## I.

I start from the premise that discrimination based on "alienage, like [that] based on nationality or race, [is] inherently suspect and subject to close judicial scrutiny."  Graham v. Richardson, 403 U.S. 365, 372, 91 S. Ct. 1848, 1852 (1971) (footnotes omitted).  In deciding that, under the Fourteenth Amendment as applied to the states, classifications based on alienage are subject to heightened scrutiny, the Supreme Court observed that noncitizens "are a prime example of a discrete and insular minority for whom such heightened judicial solicitude is appropriate." Id. (quotation marks and citation omitted).  I recognize that the Supreme Court made a significant departure from this principle when it afforded rational basis review to classifications based on "alienage" made by Congress and the President. Mathews v. Diaz, 426 U.S. 67, 83, 87, 96 S. Ct. 1883, 1893, 1895 (1976).  The Court reasoned Congress and the President are charged with "the responsibility for regulating the relationship between the United States" and our noncitizen visitors

42

and thus needed more "flexibility in policy choices" than would be appropriate for the states.  Id. at 81, 96 S. Ct. at 1892.

But the Supreme Court also set a vital limiting principle to its Diaz holding. It clarified that the federal power over noncitizens is not "so plenary that any agent of the National Government may arbitrarily subject all resident [noncitizens] to different substantive rules from those applied to citizens."  Hampton v. Wong, 426 U.S. 88, 101, 96 S. Ct. 1895, 1904 (1976).  In Hampton, the Supreme Court applied heightened scrutiny to a rule promulgated by the Civil Service Commission that excluded noncitizens from federal employment.  Id. at 90, 96 S. Ct. at 1899. Upon application of heightened scrutiny, it held that the rule was unconstitutional. Id. at 115–17, 96 S. Ct. at 1911–12.  In so doing, the Court set up a framework for deciding when classifications based on alienage made by federal agencies (not Congress or the President directly) are reviewed under the rational basis test. Hampton says it is only when an agency "has direct responsibility for fostering or protecting" an "overriding national interest" or when the rule is "a policy decision made by Congress and the President" that it will be subject to rational basis review. Id. at 103, 105, 96 S. Ct. at 1905, 1906.

As Mr. Osorto noted, when a panel of this Court held that what is now Guideline § 2L1.2(b)(2) did not violate equal protection, it never cited Hampton. Adeleke, 968 F.2d at 1160–61.  However, in holding that § 2L1.2(b)(2) rationally

43

furthered the interest in deterring unauthorized reentry, the panel noted that

Congress expressly adopted this policy by enacting 8 U.S.C. § 1326(b), which

delineated certain punishments for noncitizens "whose deportation was subsequent

to a conviction for commission of a felony." See id. (quotation marks and

emphasis omitted).  Thus I understand the Adeleke panel to have implicitly found

that Guideline § 2L1.2(b)(2) was subject to rational basis review because it

implemented a "policy decision made by Congress and the President." Hampton,

426 U.S. at 105, 96 S. Ct. at 1906.

But the Adeleke panel did not give the same treatment to Guideline

§ 2L1.2(b)(3).  This Guideline, enacted after Adeleke, mandates a four-level

increase in the offense level for noncitizens convicted of certain offenses after they

have already reentered the United States without authorization.  USSG

§ 2L1.2(b)(3).  The government argues that this Guideline serves the same purpose

as Guideline § 2L1.2(b)(2): deterring unauthorized reentry.  But logically that

cannot be the case.  The only noncitizens eligible for the § 2L1.2(b)(3) are those

who have already reentered and committed another designated offense.  This does

not include an enhancement (harsher punishment) for the offense of unauthorized

entry itself.  USSG § 2L1.2(b)(3).  In contrast to the government's argument, the

Sentencing Commission itself pointed to deterrence as the rationale for

§ 2L1.2(b)(2) but not § 2L1.2(b)(3).  See USSG am. 802, Reason for Amendment

("The (b)(2) specific offense characteristic reflects the same general rationale as the illegal reentry statute's increased statutory maximum penalties for offenders with certain types of serious pre-deportation predicate offenses[.]" (citing 8 U.S.C. § 1326(b)).  The Commission cannot, as it could with § 2L1.2(b)(2), rely on Congress's express approval to justify the harsher penalty for noncitizens reflected in § 2L1.2(b)(3).  Plainly, with § 2L1.2(b)(3), the Commission did not implement a rule or policy expressly mandated or approved by Congress or the President.  See id.

The majority says that § 1326(b) constitutes Congressional endorsement of § 2L1.2(b)(3) because it "also furthers the interest of deterrence," in that it might, theoretically, "deter future illegal reentries."  Maj. Op. at 22, 23.  But this reads both § 1326(b) and Hampton too broadly. Section 1326(b) applies only to noncitizens "whose removal was subsequent" to certain convictions.  8 U.S.C. § 1326(b)(1)–(2).  Therefore, we cannot say that it explicitly endorses the specific policy embodied by § 2L1.2(b)(3).  And Hampton directs us not to construe indications of endorsement by Congress or the President too broadly.  Hampton expressly rejected the idea that Congress endorsed the Civil Service Commission's rule just because it "repeatedly identified citizenship as one appropriate classification of persons eligible for compensation for federal service" which "implies a continuing interest in giving preference, for reasons unrelated to the

45

efficiency of the federal service, to citizens over [noncitizens]."  426 U.S. at 109,

96 S. Ct. at 1908.  The Court also rejected a number of other indicia of Congress's

endorsement of the Civil Service Commission's rule.  Among the indicia rejected

by the Court was the idea that Congress assumed that the Commission would adopt

that rule (thus obviating the need to direct the Commission to do so in legislation)

and the fact that the Commission "duly reported" the rule to Congress, which never

repudiated it.  Id. at 106, 107–08, 96 S. Ct. at 1907–08.

Instead of looking to the general policy preferences that Congress and the

President expressed, Hampton looked to the fact that neither had "expressly

prescribe[d]" the rule adopted by the Commission.  Id. at 110, 96 S. Ct. at 1908.  In

that case, not even an executive order directing the Civil Service Commission to

establish employment eligibility standards "with respect to citizenship" was

sufficient to constitute endorsement of the specific rule the Commission in fact

adopted.  Id. at 112, 96 S. Ct. at 1909 (quotation marks omitted).

The Supreme Court's preoccupation with upholding only those alienage

classifications expressly endorsed by Congress or the President is explained by the

distinction Hampton made between those federal entities that are charged with the

plenary power over immigration and those that are not.  See id. at 100–02, 96 S.

Ct. at 1904–05.  And that distinction is essential to safeguarding the right of

noncitizens to equal protection under the law.  Hampton limits the extent to which

46

federal agencies should receive extremely deferential rational basis review when it comes to alienage discrimination. See id. at 101, 96 S. Ct. at 1904 ("We do not agree . . . that the federal power over [noncitizens] is so plenary that any agent of the National Government may arbitrarily subject [noncitizens] to different substantive rules from those applied to citizens."). I fear that if we read Congressional expressions of policy preferences too broadly, as I believe the majority does today, we undermine both the constitutional rights of noncitizens and the exclusive authority of Congress and the President to decide when differential treatment of noncitizens is truly necessary.

Similarly here, I would not read into § 1326(b) a general deterrence policy. First, such a policy is not expressly addressed in § 1326(b). See 8 U.S.C. § 1326(b). Indeed, even the Sentencing Commission noted that § 1326(b) supplied the rationale for § 2L1.2(b)(2) but not § 2L1.2(b)(3). See USSG am. 802, Reason for Amendment. And the study cited by the majority lays out a forty-year history of Congress amending § 1326(b). See Maj. Op. at 22–23, 26–30. At no point during that history did Congress enact additional penalties for offenses committed after reentry. See U.S. Sentencing Comm'n, Illegal Reentry Offenses 3–5 (April 2015), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/immigration/2015_Illegal-Reentry-Report.pdf. Just as Hampton held that a history of enacting statutes and issuing

47

executive orders that accomplished similar goals was not an endorsement of the Civil Service Commission's rule, here too § 1326(b) cannot be extended to justify differential treatment of noncitizens under § 2L1.2(b)(3).

Second, absent something more direct, I would not presume that Congress thought that something so remote from an actual unlawful reentry had a deterrent effect. The study the majority cites does not tell us that this harsher punishment actually has any deterrent effect on unlawful entry. Indeed, that lack of evidence may very well explain why Congress has never, over some four decades, enacted harsher penalties for offenses committed after reentry.

## II.

Because I do not believe Congress endorsed the policy embodied by § 2L1.2(b)(3), I would not analyze it using rational basis review.

After establishing that the Civil Service Commission was not acting in the realm of immigration when it adopted the challenged regulation, the Court in Hampton applied a heightened form of review to the only reason given by the agency as within its purview. The Court recognized that "administrative convenience" may supply a "rational basis" for the challenged rule, but immediately rejected it as the proffered reason. Id. at 115, 96 S. Ct. at 1911. The Court explained that, "[f]or several reasons that justification is unacceptable in this case," a suit brought by noncitizens alleging alienage discrimination. Id. Instead,

48

the Court took the Civil Service Commission to task for failing to "perform its responsibilities with some degree of expertise, and to make known the reasons for its important decisions." Id. The Court noted the Commission's expertise in "personnel matters," while also observing the Commission had failed to adequately explain why the "administrative burden of establishing the job classifications for which citizenship is an appropriate requirement would be a particularly onerous task for [such] an expert." Id.

Even accepting that this Guideline advances the Sentencing Commission's broader interest in reflecting the seriousness of certain offenses or risk of recidivism, the Commission has not explained why those interests have not been adequately addressed by other means that apply to citizens and noncitizens alike. For example, the sentences that already apply to those underlying offenses or the inclusion of those offenses in a defendant's criminal history calculation may already reflect the seriousness of the offense and the risk of recidivism.

The majority describes the statistical study that the Sentencing Commission undertook before issuing § 2L1.2(b)(3) which noted the disparity that existed between those whose offenses pre-dated and post-dated their removal. Maj. Op. at 28–29. But this study is not sufficient for at least two reasons. First, this study is just a data collection project that recites various statistical findings and explains the Commission's methodologies. See generally Illegal Reentry Offenses. There is no

49

discussion of the effectiveness of harsher sentences as a deterrent or the values or goals that varying sentences help to promote. Second, the disparity that the study describes is accounted for by the fact that § 2L1.2(b)(2) acts to deter unlawful reentry. There is no similar immigration-related deterrence value, at least none expressly endorsed by Congress, that animates § 2L1.2(b)(3).[1] And the study cited by the majority never explains why the need to reflect culpability or risk of recidivism outweighs the right of noncitizens to equal treatment, especially given the weight of the liberty interest at stake: "freedom from imprisonment." See Zadvydas v. Davis, 533 U.S. 678, 690, 121 S. Ct. 2491, 2498 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Fifth Amendment's Due Process] Clause protects."); see generally Illegal Reentry Offenses. In the absence of a justification that recognizes the discriminatory effect of § 2L1.2(b)(3) and explains why differential treatment is necessary to advance an "overriding national interest," I am not convinced the Sentencing Commission has met its burden under Hampton's heightened scrutiny. Hampton, 426 U.S. at 103, 96 S. Ct. at 1905.

**III.**

---

[1] And the Sentencing Commission could also have eliminated this disparity by simply eliminating the enhancements in § 2L1.2(b)(2).

I believe the majority erred by finding that Congress endorsed the policy advanced by § 2L1.2(b)(3).  I fear the majority's approach to <u>Hampton</u> undermines the very framework its ruling instructed us to follow.  For Mr. Osorto's case, that error leads to the preservation of a Sentencing Guideline that I believe unconstitutionally deprives noncitizens of their liberty.  For these reasons, I respectfully dissent.